**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 08-20424-CIV-UNGARO

PREFERRED CARE PARTNERS HOLDING
CORP., a Florida corporation, PREFERRED
CARE PARTNERS, INC., a Florida corporation,
    Plaintiffs,

vs.

HUMANA, INC., a foreign corporation,
    Defendant.
_____/

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

THIS CAUSE is before the Court upon Defendant's Motion for Summary Judgment on

the Amended Complaint, filed November 21, 2008 (D.E. 92, the "Humana Motion").  Plaintiffs

filed a response on December 11, 2008 (D.E. 114), to which Defendant replied on December 22,

2008 (D.E. 129).  Also before the Court is Plaintiffs' Amended Motion for Partial Summary

Judgment of Liability, Specific Performance and Permanent Injunction as to Their Claims for

Breach of Contract, filed November 24, 2008 (D.E. 104, the "Plaintiff Motion").  Defendant filed

its response on December 12, 2008 (D.E. 122), to which Plaintiffs replied on December 22, 2008

(D.E. 131).  The matters are ripe for disposition.

THE COURT has considered the Motions and the pertinent portions of the record and is

otherwise fully advised in the premises.

**BACKGROUND**

**I.      The Parties**

Plaintiff Preferred Care Partners Holding Corp. ("PCP Holdings") is a privately-held

1

corporation and 100% shareholder of Plaintiff Preferred Care Partners, Inc. ("Preferred Care"). (D.E. 90, the "Am. Compl." at ¶¶ 1-2.)  PCP Holdings is "operational" to the extent that it performs management and other services for other operational entities.  (Caruncho Dep. 11:6-24, 12:1-3, Apr. 11, 2008.)

Preferred Care is a health plan with a Medicare Advantage Contract that operates in South Florida.  (Am. Compl. ¶ 2.)  Preferred Care contracts physician providers for its network, and the doctors in turn provide medical care for Preferred Care's members.  (Am. Compl. ¶ 26.) Preferred Care generally pays its contracted providers in the form of "capitation rates," which are fixed monthly amounts that the providers receive per member that they treat, plus certain performance-based "bonuses."  (Am. Compl. ¶ 27.)

Defendant Humana, Inc. ("Humana") is a publicly-traded health benefits company that similarly operates Medicare Advantage Plans in South Florida through its wholly-owned subsidiaries, such as CarePlus Health Plans, Inc. ("CarePlus").  (Am. Comp. ¶ 3.)  Humana has compensated its providers using a capitation-plus-bonus type structure "since the beginning of time in one form or another," but does not pay bonuses to all of its providers.  (Humana's Statement of Material Facts (D.E. 93, "Humana SMF") ¶ 18; Plaintiffs' Statement of Material Facts in Opposition to Defendant's Motion (D.E. 115, "Pls' Opp. SMF") ¶ 18.)  CarePlus has used this compensation structure (capitation plus bonus) with its own providers since 2001-2002. (Orozco Dep. 63:5-13, 70:8-13, May 29, 2008.)

Preferred Care and Humana are direct competitors for the enrollment of Medicare beneficiaries in their respective Medicare Advantage Plans in South Florida.  (Am. Comp. ¶ 4.) In 2007, Humana operated the largest Medicare Advantage Plan in Miami-Dade County, Florida,

and Preferred Care had the second largest plan.  (Am. Comp. ¶ 4.)

## II.    The Sale

In or about May 2007,  Humana expressed an interest in purchasing Plaintiffs' businesses.

(Am. Compl. ¶ 5.)  In connection with this proposed transaction, the parties executed a

Confidentiality Agreement, which contained the following pertinent provisions:

- Humana agreed "not to initiate contact, or engage in discussions, with any employee, customer, or supplier of PCP without the prior consent of . . . PCP," but that such prohibition did not apply to "normal and routine contacts made in the ordinary course of business consistent with past practice."

- Humana agreed not to use the confidential information it received in the due diligence process in its business or disclose it to any third party, unless such information is publicly available, was known prior to disclosure, or becomes available on a non-confidential basis from a third-party.

- Humana agreed that if it communicated any confidential information to its directors, officers, advisors, or employees, it would (i) inform each such person that the information is strictly confidential and subject to the Confidentiality Agreement, and (ii) secure a written agreement from each such person agreeing to be bound by the Confidentiality Agreement and to not disclose or use the confidential information, except as provided under the Confidentiality Agreement.

- Humana agreed not to disclose that it was even in sale negotiations with Plaintiffs.

- Humana agreed that it would be jointly and severally responsible for any breach of the Confidentiality Agreement by its "officers, directly, advisors, and/or employees, or any of [its] representatives."

- Humana recognized that the confidential information it would receive from Plaintiffs is "a valuable assets of PCP[1] and its members, has competitive value and is of a confidential nature."

- Humana agreed that money damages would not be sufficient remedy for

_____

[1]      "PCP" is defined in the Confidentiality Agreement to include PCP Holdings, Preferred Care, and Integral Pharmacy Services, Inc.

3

any breach of the Confidentiality Agreement by its employees, agents, equityholders, lenders, advisors, or representatives and that Plaintiffs would be entitled to specific performance and injunctive relief as remedies for such breach.

The Confidentiality Agreement was signed on May 7, 2007, by Thomas Liston, Senior Vice President of Strategy & Corporate Development at Humana.[2]   The Confidentiality Agreement covered PCP Holdings, Preferred Care, and Integral Pharmacy Services.[3]   The Confidentiality Agreement was effective until the earlier of either (i) the termination of the sale process, or (ii) May 7, 2009.  Under the agreement, Plaintiffs are entitled to recover reasonable attorneys fees in the event of litigation for a breach of the agreement.

After signing the Confidentiality Agreement, Humana began its due diligence investigation.  Humana's due diligence team consisted of over 100 individuals, most of whom were granted access to Plaintiffs' data room containing their confidential information.  (Am. Comp. ¶ 46; *see also* Humana Due Diligence Team List, filed as Exhibit 4 to Plaintiffs' Reply Memorandum).)  Plaintiffs also shared confidential information with Humana during the due diligence period at meetings and presentations.  (*See, e.g.*, Rodriguez Dep. 60-62, Sept. 8, 2008.)

During this time, Plaintiffs provided Humana with general information about Preferred Care's provider-compensation structure.  (Am. Compl. ¶ 53; Humana's Statement of Material Facts (D.E. 93, "Humana SMF") ¶ 16.)  Humana did not receive, however, any specific provider compensation information.  (Orozco Depo. 57:6-16, 62:5-9, May 29, 2008; Vasquez 14:1-4, 16-

---

[2]     A copy of the Confidentiality Agreement is attached as Exhibit "A" to the Amended Complaint.

[3]     Integral Pharmacy Services is also a subsidiary of PCP Holdings, but is no longer a party to this litigation.  (*See* Plaintiffs' Motion for Leave to Amend Complaint (D.E. 53) at 1 n.1; Am. Compl. ¶ 31.)

17, Apr. 3, 2008.)  Humana only received a couple of primary care provider contracts that had

rate information, but even for those couple of contracts the providers' names had been redacted.

(Vazquez Dep. 14:20-24.)  Plaintiffs also provided Humana with an Excel worksheet detailing all

of Preferred Care's providers; however, this same information was also publicly available in

other forms on the internet and in Preferred Care's provider directories.  (Humana SMF ¶ 20;

Pls' Opp. SMF ¶ 20.)

     Humana continued its due diligence for approximately five months.  (Am. Compl. ¶ 47.)

During this time, two key events occurred:

     First, Preferred Care terminated its contract with Baptist Health System, which included

four hospitals, just shortly before its membership open enrollment period ended.  (Humana SMF

¶ 32.)  Humana argues that once Preferred Care's members learned that they could no longer use

the Baptist Health System, they disenrolled from Preferred Care at the next open enrollment

period, causing a significant drop in Preferred Care's membership. (*See* Humana Motion at 2.)

     Second, Humana renegotiated its provider contracts with Drs. Carrillo and Ojeda, two

doctors who were also in Preferred Care's network.  (Humana SMF ¶¶ 9, 11-13.)  The

renegotiated contracts provided Drs. Carrillo and Ojeda with a flat capitation rate plus bonus that

was greater than what they had previously negotiated with Preferred Care.  (Ojeda Dep. 26:14-

25, 38:23-24, May 16, 2008; Carrillo Dep. 11:22-25, 12:25, 24:6-23.)  After Dr. Carrillo

renegotiated his Humana contract, he terminated his Preferred Care contract because he wished

to work only with one health care plan for administrative purposes.  (Carrillo Dep.20:17-23,

41:17-18.)  Preferred Care terminated Dr. Ojeda's contract after its was informed that he had

renegotiated a better rate with Humana, although Dr. Ojeda would have otherwise stayed in

Preferred Care's network.  (Ojeda Dep. 77:19-24.)  Plaintiffs argue that Drs. Carrillo and Ojeda were two of their largest providers and that they suffered a decrease of approximately 700 members when Humana lured away these doctors away.  (Am. Compl. ¶¶ 67, 70.)

## III.   The Lawsuit

The parties' sale negotiations ultimately terminated in October 2007.  Plaintiffs filed the instant suit in February 2008, alleging that Humana used Plaintiffs' confidential information to lure away Plaintiffs' valuable providers and members.  (Am. Compl. ¶¶ 8, 12-13.)  Plaintiffs also allege that Humana failed to comply with the terms of the Confidentiality Agreement because (i) during the sale negotiations Humana failed to secure written agreements from its due diligence team to be bound by the Confidentiality Agreement, and (ii) after the sale negotiations terminated, Humana failed to destroy documents containing Plaintiffs' confidential information. (Am. Comp. ¶¶ 90(e)-(f).)  Specifically, Plaintiffs' Amended Complaint seeks damages and attorneys' fees for breach of the Confidentiality Agreement (Count I), specific performance and injunctive relief (Count II), misappropriation of trade secrets (Counts III and IV), and tortious interference with advantageous business relationships (Count V).[4]

## LEGAL STANDARD

Summary judgment is authorized only when the moving party meets its burden of demonstrating that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56.  When

---

[4]      Earlier in the case, the Court dismissed with prejudice Plaintiffs' claims for breach of good faith and fair dealing and breach of fiduciary duty because they were redundant of their claim for breach of contract and barred by the economic loss rule.  (*See* D.E. 24 and 86.)

determining whether the moving party has met this burden, the court must view the evidence and all factual inferences in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Rojas v. Florida*, 285 F.3d 1339, 1341-42 (11th Cir. 2002).

The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of proving that no genuine issue of material fact exists, the non-moving party must make a sufficient showing to establish the existence of an essential element to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrell*, 477 U.S. 317 (1986); *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997); *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir. 1989).

If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. *Envntl. Def. Fund v. Marsh,* 651 F.2d 983, 991 (5th Cir. 1981).[5] Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969). If reasonable minds might differ on the inferences arising from undisputed facts then the court should deny summary judgment. *Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.,* 669 F.2d 1026, 1031 (5th Cir. 1982); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[T]he dispute about a material fact is 'genuine,' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

---

[5]     Decisions of the United States Court of Appeals for the Fifth Circuit entered before October 1, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

Moreover, the party opposing a motion for summary judgment need not respond to it with evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes*, 398 U.S. at 160. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or otherwise are not in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611-12 (5th Cir. 1967). The Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. Liberty Lobby, Inc., 477 U.S. at 255.

## ANALYSIS

### I.    Humana's Motion for Summary Judgment

Humana's Motion contains four arguments: (1) Any loss of value suffered by PCP Holdings is solely as a result of its status as the 100% shareholder of Preferred Care and is not actionable; (2) Plaintiffs' allegations about "poaching" and improper solicitation of Preferred Care providers Drs. Carrillo, Ojeda and Gauty fail as a matter of because Humana's dealings with these doctors did not violate the Confidentiality Agreement; (3) Plaintiffs cannot show causation between any alleged leak by Humana of its possible acquisition of Plaintiffs' businesses and any loss of specific members; and (4) Plaintiffs' tortious interference claims fail as a matter of law because they are either barred by the economic loss rule or because they require piercing the corporate veil, which Plaintiffs have not alleged. The Court will examine and dispose of each of these arguments in turn.

### A.    Whether PCP Holdings' Claims are Actionable

Humana argues that because PCP Holdings is simply a shareholder of Preferred Care any

rights it may have to sue Humana are merely derivative of Preferred Care's rights, and, therefore, PCP Holdings' claims must be denied because it has suffered no compensable loss. Humana recognizes, however, that there is an exception to this shareholder loss rule when the shareholder can show that it is owed a separate special duty apart from the duty owed to the corporation. *See U.S. v. Palmer*, 548 F.2d 144, 145-46 (5th Cir. 1978).

     **(i)**     **Breach of Contract**

The Court finds that PCP Holdings' breach of contract claims are actionable because it is clearly a party to the Confidentiality Agreement and, thus, owed a special independent duty under that agreement. The question then becomes whether PCP Holdings has suffered an injury as a result of Humana's breach of that duty. In the Confidentiality Agreement, Humana expressly acknowledged that the information it would receive in connection with the possible sale of Plaintiffs' businesses "is a valuable asset of PCP[6] and its members, has competitive value and is of a confidential nature." Accordingly, any disclosure of PCP Holdings' confidential and valuable information caused a recognizable harm, although that harm may be difficult to quantify. Under Florida law, a party may recover nominal damages for breach of contract even if it cannot prove actual damages. *See Destiny Constr. Co. v. Martin K. Emby Constr.*, 662 So.2d 388, 390 (Fla. 5th DCA 1995). Accordingly, the Court finds that Humana is not entitled to judgment as a matter of law on PCP Holdings' claim for breach of the Confidentiality Agreement.

     **(ii)**     **Tortious Interference**

---

[6]     "PCP" is defined in the Confidentiality Agreement to include PCP Holdings, Preferred Care, and Integral Pharmacy Services, Inc.

Humana further argues that PCP Holdings cannot maintain its tortious interference claim because (i) it has admitted that it has suffered no direct pecuniary losses, and (ii) nominal damages are not recoverable on a tortious interference claim.  In response, Plaintiffs argue that this "admission" was qualified, and, thus, there remains a genuine issue of material fact as to whether PCP Holdings suffered any direct losses.  The Court finds that any loss PCP Holdings sustained – regardless of any alleged admission –  must necessarily be indirect because the Amended Complaint fails to allege that PCP Holdings had or has a business relationship with Preferred Care's members and providers.  (*See* Am. Compl. ¶¶ 114-118.)

In order to state a cause of action for tortious interference under Florida law, a plaintiff must allege the following: (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damages to the plaintiff as a result of the breach of the relationship.  *Tamiami Trail Tours, Inc. v. Cotton*, 463 So.2d 1126, 1127 (Fla. 1985).  The Amended Complaint clearly states that Humana allegedly interfered with Preferred Care's contractual relationships with its providers and members.  (*See* Am. Compl. ¶ 116.[7])  There are no allegations that Humana interfered with any of PCP Holdings' contractual relationships.  Thus, any harm suffered by PCP Holdings for Humana's tortious interference with Preferred Care's contracts would be an indirect harm.  Consequently, PCP Holdings cannot maintain its claim against Humana for tortious interference.  *See Alario v. Miller*, 354 So.2d 925, 926 (Fla. 2d DCA 1978) ("If the damages are only indirectly sustained to the stockholder as a result of injury

---

[7]        The Amended Complaint reads, "As a direct and proximate result of Humana's intentional and unjustifiable interference with <u>PCP</u>'s contractual relationships with its members and physician providers, <u>Plaintiffs</u> have been damaged."  (Am. Compl. ¶ 118 (emphasis added).)

to the corporation, the stockholder does not have a cause of action against the individual.");

*Martens v. Barrett*, 245 F.2d 844, 846 (5th Cir. 1957) ("And it is universal that where the

business or property allegedly interfered with by the forbidden practices is that being done and

carried on by a corporation, it is that corporation alone, and not its stockholders . . . who has a

right of recovery. . . ."). Accordingly, the Court grants Humana judgment as a matter of law on

PCP Holdings' tortious interference claim.

### (iii)     Misappropriation of Trade Secrets

Finally, Humana argues that PCP Holdings cannot maintain its claim for

misappropriation of trade secrets under FUTSA because (i) it has admitted that it has suffered no

direct pecuniary losses, and (ii) nominal damages are not recoverable under FUTSA.  In

response, Plaintiffs argue that even if PCP Holdings only suffered nominal damages, its FUTSA

claim survives because they seek injunctive relief in addition to damages.  The Court agrees.

There are two elements to a claim under Florida law for misappropriation of trade secrets:

(1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy; and

(2) the secrets it possessed was misappropriated.  *See Del Monte Fresh Produce Co. v. Dole

Foods Co.*, 136 F.Supp.2d 1271, 1291 (S.D. Fla. 2001).  There is simply no damages

requirement.  Nonetheless, Humana argues that PCP Holdings' claim fails under *Alphamed

Pharmaceuticals Corp. v. Arriva Pharmaceuticals, Inc*., 432 F.Supp.2d 1319 (S.D. Fla. 2006).

Humana cites this case for the proposition that nominal damages are not available under FUTSA,

and Plaintiffs have no proof of damage as to PCP Holdings.  The Court rejects Humana argument

because in *AlphaMed* the plaintiff elected to seek damages alone and did not maintain a claim for

injunctive relief.  432 F.Supp.2d at 1335.  The *AlphaMed* court held that "a plaintiff may not

11

maintain a claim for misappropriation of trade secrets without presenting evidence of damage or a claim for injunctive relief." *Id.* at 1338 (emphasis added). The court then went on to hold that the plaintiff had not put forth any proof of damages and did not seek injunctive relief, and, therefore, defendant was entitled to judgment as a matter of law.  Meanwhile, in this case, PCP Holdings seeks injunctive relief under FUTSA.  Accordingly, the Court denies Humana's Motion for Summary Judgment as to PCP Holdings' FUTSA claim.

### B.      Allegations Regarding Drs. Ojeda, Carrillo, and Guanty

Humana's second argument in its Motion is that it did not breach the Confidentiality Agreement by contacting Preferred Care providers Drs. Ojeda, Carrillo, and Guaty because its dealings with those providers were "normal and routine contacts made in the ordinary course of business" and did not involve the misuse of Preferred Care's confidential information.

In the Confidentiality Agreement, Humana agreed "not to initiate contact, or engage in discussions, with any employee, customer, or supplier of PCP without the prior consent of . . . PCP." (Confidentiality Agreement at 1 (emphasis added).)   It qualified this prohibition, however, by stating that this prohibition "shall not apply to normal and routine contacts made in the ordinary course of business consistent with past practice." (*Id.* (emphasis added).) Additionally, Humana agreed to not use the information it received in the due diligence process in its business or disclose it to any third party, unless such information was publicly available, was known prior to disclosure, or became available on a non-confidential basis from a third-party.  (*Id.*)  Finally, Humana agreed to not disclose that it was even in negotiations with Plaintiffs regarding a possible sale.  (*Id.* at 2.)

Plaintiffs allege that Humana breached the Confidentiality Agreement by, *inter*

*alia*,

> allowing and directly encouraging Humana employees and representatives to engage in contract negotiations with two of PCP's physician providers, Dr. Pedro Carrillo and Dr. Juan Ojeda, which involved a compensation scheme that falls outside the normal compensation scheme offered to physician providers of Humana's Medical Advantage Plans in South Florida and significantly differs from Humana's past practices in contracting with physician providers, at a time when Humana was conducting the due diligence process and negotiating the acquisition of Plaintiffs, all without Plaintiffs' consent.

(Am. Compl. ¶ 90(h).)  Plaintiffs then make an identical allegation against Humana with regard to "three other of PCP's valuable physician providers."  (Am. Compl. ¶ 90(i).)  Although Plaintiffs do not identify these "three other" Preferred Care providers by name in the Amended Complaint, its appears from Humana's Motion and Plaintiffs' Response to that Motion this allegation refers to Dr. Guaty's three-member medical group.[8]  (*See* Humana Mot. at 5; Pls' Response at 8.)

Humana moves for summary judgment on these factual allegations.  It argues that although it engaged in contract negotiations with Drs. Carillo, Ojeda, and Guaty during the due diligence period, these negotiations were "normal and routine" discussions within its ordinary course of business and, thus, not prohibited by the Confidentiality Agreement.  Further, Humana argues that Plaintiffs cannot meet their burden of proving that Humana used any confidential information it may have received during the due diligence period in its discussions with these doctors because (i) the doctors' Preferred Care provider contracts were not in the data room, and (ii) the "base capitation rate plus bonus" compensation structure Humana ultimately negotiated with the doctors is not unique only to Preferred Care.

---

[8]     The three members are Dr. Nestor Guaty, Dr. Jorge Pereira, and Dr. Guillermo Lopez.  (Guaty Dep. 7:9-11, July 11, 2008.)

13

In response, Plaintiffs argue that these contract negotiations were not in the ordinary course of business because Humana's "ordinary course" was to have Management Service Organizations ("MSO's") directly contract with its providers and to pay its providers a base capitation rate without any bonuses.  (Pls' Resp. at 9.)  Meanwhile, Plaintiffs allege that the evidence shows that Humana agreed to pay bonuses to Drs. Carillo, Ojeda, and Guanty and that Drs. Carrillo and Ojeda contracted directly with Humana rather than its MSOs.  (*Id*.)  Finally, Plaintiffs argue that because Humana's Balbino Vasquez set the contract rates for Drs. Carilo and Ojeda with full knowledge of Preferred Care's provider-compensation rates, he "used" confidential information gained during the due diligence period.  (*Id.*)

### (i)      Contacts in the Ordinary Course of Business

After careful consideration of the evidence, the Court finds that there are no genuine issues of material fact as to whether Humana dealt with Drs. Carrillo and Ojeda outside the ordinary course of business in violation of the Confidentiality Agreement.  The undisputed evidence shows that Humana did not initiate contact with Drs. Carrillo and Ojeda, but that these two doctors independently initiated contact with Humana when they learned that a mutual colleague and close friend, Dr. Gonzalez, had recently negotiated a good rate with Humana. (Carrillo Dep. 21:10-24, May 30, 2008; Ojeda Dep. 36:7-20, May 16, 2008; Friere Depo. 81:3-24.)[9]  Thus, Humana cannot have violated the Confidentiality Agreement because it plainly

---

[9]      Plaintiffs point out that Dr. Ojeda did not call Humana directly, but that rather Dr. Ojeda asked Dr. Gonzalez to contact Humana on his behalf. (*See* Pls' Resp. SMF ¶ 5.)  This, however, is a distinction without a difference and does not create a material issue of fact.  The Confidentiality Agreement focuses on who *initiated* contact – not who ultimately made the phone call – and Dr. Ojeda's testimony repeatedly demonstrates that he initiated the contact with Humana.  (*See, e.g.,* Ojeda Depo. 112:4-6.)

prohibits Humana from soliciting doctors outside the ordinary course of business, and, here, Humana did not solicit Drs. Carrillo and Ojeda.  Rather, it was the doctors who approached Humana.

There is also no evidence that Humana's discussions with Drs. Carrillo and Ojeda were outside the ordinary course of business.  Drs. Carillo and Ojeda were already Humana providers at the time they initiated discussions with Humana to renegotiate their contracts.  (*See* Friere Depo. 84:4-6.)  Plaintiffs carry the burden of demonstrating a genuine issue of material fact as to whether responding to the doctors' inquiries or renegotiating their provider contracts was outside Humana's ordinary course of business, but Plaintiffs have offered no such evidence.

Further, given the following evidence, it is speculation to say that these renegotiations occurred outside the ordinary course of business simply because Drs. Carillo and Ojeda are not presently Preferred Care providers:  (i) Dr. Carrillo stated that he terminated his Preferred Care contract because he only wished to work with one HMO for administrative purposes; (ii) Preferred Care - not Dr. Ojeda - terminated Dr. Ojeda's contract upon his renegotiations with Humana; (iii) both doctors testified that Humana did not require them to terminate their Preferred Care contracts; and (iv) neither of the doctors remember that the possible sale of Preferred Care to Humana was even mentioned during the negotiations.  (*See* Carrillo Dep. 20-21, 31:5-17; Carrillo's Sworn Declaration, Ex. A. to Carrillo Dep., 12:19-25, Mar. 7, 2008; Ojeda Dep. 77:19-24, 110:19-24, 54:23-25, 55:1-12.)  Additionally, the doctors testified that although they had heard rumors that Preferred Care might be sold, Humana offered them better compensation, and their decisions to renegotiate their contracts with Humana were business decisions.  (*See* Ojeda Dep. 63:12-20, 110:7-15; Ojeda Sworn Declaration, 12:23-25, 13:1;

15

Carillo Sworn Declaration 17:20-22.)  Finally, Plaintiffs' argument that the renegotiated

contracts themselves are outside the ordinary course of business because both Drs. Carrillo and

Ojeda contracted directly with Humana, rather than with MSOs, is speculative where the

undisputed evidence shows that Drs. Carrillo and Ojeda reached out to Humana and specifically

requested to have contracts directly with Humana as a form of security. (Friere Depo. 88:2-5;

Ojeda Depo. 58:15-17; Carrillo Depo. 29:4-16.)

With respect to Dr. Guaty and his practice, Plaintiffs present no evidence that Humana

solicited his practice outside the ordinary course of business.  Dr. Guaty testified that his

practice was contacted by the Joan Borrego of South Florida Physicians Management Group,

one of Humana's MSOs, in August 2007 regarding a provider agreement with Humana.  (Guaty

Dep. 10:18-25, 11:1-4.)  As an initial matter, the Court notes that Juan Borrego is not an

employee of Humana or any of its subsidiaries; therefore, the Confidentiality Agreement does

not apply to him.  (Borrego Dep. 14:14-22, 17:3-12, 18-7-13.)  To the extent, however, that Juan

Borrego arguably qualifies as a "representative" of Humana[10] when he solicited Dr. Guaty,

Plaintiffs have presented no evidence that such solicitations were outside Humana's ordinary

course of business.[11]   To the contrary, Santiago Freiere stated that Humana would sometimes

---

[10]     As discussed in more detail below, the Confidentiality Agreement holds Humana,
Inc, "jointly and severally responsible for any breach of [the Confidentiality Agreement by [its]
officers, directors, advisors, and/or employees or any of [its] representatives."  The
Confidentiality Agreement does not contain a definition of "representatives."

[11]     Additionally, the Court notes that Dr. Guaty and his practice were already
investigating the possibility of signing with a new plan when it was contacted by Borrego
because the practice was located at a Baptist facility and Preferred Care had terminated its
contract with Baptist Hospital.  Thus, the practice was concerned about losing patients. (Gauty
Dep.26:12-25, 27:1-11.)  In fact, Dr. Guaty's patients had already complained and expressed
frustration that Preferred Care had terminated its contract with Baptist.  (Gauty Dep. 34:16-20.)

reach out to providers and try to expand their provider network.  (Freiere Dep. 38:20-23.)

       **(ii)**      **Use of Confidential Information**

      Finding that Humana did not initiate contact with Drs. Carrillo, Ojeda, and Gauty

outside the ordinary course of business, the Court must next consider whether, nonetheless,

Humana breached the Confidentiality Agreement by <u>using</u> any confidential information in its

discussions with the providers.  Plaintiffs argue that there is circumstantial evidence supporting

a finding that Humana used Plaintiffs' confidential provider rate information; namely, that

Humana knew that Preferred Care generally compensated its providers with a base capitation

rate plus a bonus and that Humana's new contracts with Drs. Carrillo, Ojeda and Guanty had

this same compensation structure.  Meanwhile, Humana argues that it did not have access to

information regarding Preferred Care's provider rates and that Preferred Care's compensation

structure is not so unique in the industry that it can prove as a matter of law that Humana

improperly used any information it may have received during the due diligence process.  For the

reasons stated below, the Court finds that there are no genuine issues of material fact as to

whether Humana misused Plaintiffs' confidential information as to Drs. Carrillo, Ojeda, and

Guaty.

      First, with respect to Drs. Carillo and Ojeda, Plaintiffs cannot establish that Humana

used any information obtained during the due diligence period to lure these doctors away from

Preferred Care because they cannot show that they even provided any information regarding

these doctors' rates to Humana.  For example, Preferred Care's own CEO states that Plaintiffs

---

Finally, the Court notes that Dr. Guaty and his partners were at all times, and continue to be,
Preferred Care providers.  (Gauty Dep. 31:21-24.)

likely did not upload their provider contracts until late October 2007.  (*See* Caruncho Dep. 307:1-23.)  Meanwhile, Drs. Carillo and Ojeda renegotiated their contracts with Humana in September 2007.  Additionally, Humana employees Balbino Vazquez[12] and Tomas Orozco,[13] both of whom had access to Plaintiffs' confidential information, testified that Humana did not receive any compensation-related information on any particular Preferred Care provider.[14] (Orozco Depo. 57:6-16, 62:5-9; Vasquez 14:1-4, 16-17.)  Plaintiffs have presented no evidence to the contrary.  Therefore, the undisputed evidence is that Humana did not have access to the rates Preferred Care had in place with Drs. Carillo and Ojeda at the time it renegotiated their contracts, thereby foreclosing the possibility that it could have used such confidential information to lure the doctors away from Preferred Care.  Humana could not have used what it did not have.

Second, with respect to Dr. Guaty, Plaintiffs present no evidence that Humana received any information regarding the rates his practice had previously negotiated with Preferred Care. As stated above, the undisputed evidence is that Humana did not have access to information regarding the rates Preferred Care had with any one of its particular providers.  Again, Humana cannot have violated the Confidentiality Agreement by using information it never received.

Third, Plaintiffs' argument that Humana must have misused confidential information

---

[12]     Balbino Vazquez is the Chief Financial Officer for Humana in South Florida.

[13]     Tomas Orozco is the senior director of provider contracting and provider servicing for CarePlus, a wholly-owned subsidiary of Humana.

[14]     Vazquez testified that Humana had received only a couple of primary care contracts that had rate information, but that for those couple of contracts the physicians' names had been redacted.  (Vazquez Dep. 14:20-24.)

regarding their provider rates because it offered the same compensation structure to Drs.

Carrillo, Ojeda and Guaty is speculative in light of the following undisputed evidence:

- Vasquez, the party who decided to structure Drs. Carillo and Ojeda's compensation with a bonus component, testified that
  - this compensation structure is pretty common in the industry,
  - Humana provided similar bonuses to at least some of its providers, and
  - he was aware of this compensation structure before entering the due diligence period with Preferred Care.
  (Vasquez Dep. 157:14-24, 158:3-25, 159:1-13.)[15]

- Tomas Orozco testified that
  - Humana already knew how Preferred Care generally compensated its providers before the due diligence process even began, and
  - CarePlus (Humana's wholly-owned subsidiary) has used this formula with its own providers since 2001-2002.
  (Orozco Dep. 63:5-13, 70:8-13.)

In other words, taking the record as a whole, Plaintiffs have not shown that there is a genuine issue of fact as to whether their compensation structure was so unique that Humana must have known and used their confidential information when it renegotiated Drs. Carrillo and Ojeda's contracts and when it negotiated its contract with Dr. Guaty's practice.

In sum, the Court finds that Plaintiffs have pointed to no specific facts from which a reasonable juror could conclude that Humana ever had access to and, thus, used Plaintiffs' provider rate information.  *See* Fed. R. Civ. P. 56(e) (requiring non-movant to come forward with "specific facts showing a genuine issue for trial").  Indeed, all that is before the Court is speculation (*e.g.*, Humana must have had access because the doctors' compensation looks like

---

[15]     Plaintiffs argue that there is a genuine of material fact because Vazquez testified that, at the time it renegotiated its contracts with the doctors, Humana did not pay bonuses to all of its providers.  (Pls' SMF ¶ 18.)  The Court does not find this fact material, especially where there a complete reading of Vaxquez's testimony reveals that Humana did provide bonuses to its providers, as many other companies in the industry, but that it did not provide bonuses to *all* of its providers. (*See* Vazquez Dep. 158:24-25, 159:159:1-13.)

what Preferred Care had offered them, just better) that is fully controverted by direct evidence (*e.g.,* Humana showing that it never received information regarding these doctors' rates with Preferred Care). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (stating that the dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return verdict for the nonmoving party).

In reaching the conclusion that no genuine issue of material fact remains with respect to Humana's dealings with Drs. Carrillo, Ojeda, and Guaty, the undersigned acknowledges that Plaintiffs vigorously dispute almost each and every one of Humana's Statements of Material Fact. However, Plaintiffs do not demonstrate that any of their disputed facts are material. As the Supreme Court has stated, "[T]he existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* (emphasis in original).

Further, as the non-movants, Plaintiffs must do more than aggressively assert that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Plaintiffs "must come forward with specific facts showing that there is a genuine issue for trial." *Id.* at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis added). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted). It is Plaintiffs' burden to show that there is a genuine issue for trial as to whether the doctors were contacted outside the ordinary course of Humana's business. However, Humana has shown that it did not contact Drs. Carrillo and Ojeda, and that any contact Borrego initiated with Dr. Gauty's practice was within the ordinary course of its business. Similarly, it is Plaintiffs'

20

burden to show that such contract renegotiations were outside the ordinary business, but they have offered no evidence to support such an argument.  Further, it is Plaintiffs' burden to show that Humana used any confidential information it acquired during the due diligence process in its negotiations with the doctors, but when confronted with direct evidence that Humana lacked any such information, Plaintiffs have failed to come forward with any specific facts showing that there is a genuine issue for trial.  Accordingly, the Court grants Humana's Motion for Summary Judgment on the allegations contained in paragraphs 90(h) and 90(i) of Count I and paragraphs 95(h) and 95(i) of Count II.[16]

### C.    Causation

Humana's third argument in its Motion for Summary Judgment is that Plaintiffs cannot show that "Humana employees leaked information to the public about a possible acquisition of PCP and that the leaks and rumors directly caused mass confusion and uncertainty in the marketplace, which proximately caused the precipitous disenrollment of members from PCP during the open enrollment period in November 2007."[17]  (Humana Motion at 12.)  Humana argues that Plaintiffs cannot show that any member or provider disenrolled or altered its business dealings with Preferred Care because it heard a rumor from Humana that it was

---

[16]    The Court notes that in addition to alleging that Humana violated the Confidentiality Agreement with regards to Drs. Carrillo, Ojeda, Guaty, Plaintiffs' Amended Complaint contains broader allegations against Humana regarding its targeting and luring Plaintiffs' providers and members.  (*See, e.g,* Am. Compl. ¶¶ 90(d), (g).)  Humana only moves in its Motion, however, for judgment as a matter of law that it did not breach the Confidentiality Agreement with regards to its dealings with Drs. Carrillo, Ojeda, Guaty.  (*See* Humana Motion at 9.)  Accordingly, the Court's grant of summary judgment is limited only to the allegations regarding these three doctors and not any other of Preferred Care's doctors or members.

[17]    As mentioned above, any such disclosure about the pending sale would be a breach of the Confidentiality Agreement.

acquiring Preferred Care.  (*Id.*)  Thus, Humana argues that Plaintiffs must rely on two

unreasonable inferences from circumstantial evidence in order to succeed on their claims: (i)

that the rumors circulating in the marketplace came from Humana; and (ii) that any rumor

originating from Humana caused disenrollments. (*Id.* at 12-13.)  Humana argues that any jury

verdict in favor of Plaintiffs would necessary require an impermissible stacking of these two

inferences and, thus, be too speculative to survive as a matter of law.

Humana's argument fails under Eleventh Circuit precedent.  *In Daniels v. Twin Oaks*

*Nursing Home*, 692 F.2d 1321, 1323-24 (11th Cir. 1983), the Eleventh Circuit clearly stated that

the rules regarding sufficiency of evidence and pyramiding inferences are matters of federal law

and that, according to federal law, there is no prohibition against pyramiding inferences so long

as they reasonable.[18]  The Eleventh Circuit further held that inferences are not made

impermissible simply because there may be other equally probably inferences.  *Id.* at 1324.

Finally, all inferences at this stage must be drawn in favor of Plaintiffs, as the non-moving party.

*See Van v. Miami-Dade County*, 509 F.Supp. 2d 1295, 1299 (S.D. Fla. 2007).

In light of the foregoing, the Court must first determine whether it is reasonable to infer

that Humana leaked a rumor regarding the sale in violation of the Confidentiality Agreement.

Humana argues that such an inference would be unreasonable because there are many other

possible sources for the rumors, such as Wellcare and Medica (two competing health plans) and

---

[18]        Citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007), Humana
also argues that the inferences in favor of Plaintiffs must be "compelling" and "strong in light of
other explanations."  The Supreme Court articulated this standard in *Tellabs,* however, in the
context of determining whether a plaintiff in a securities case adequately plead a "strong
inference" of scienter as expressly required under federal securities law.  As this case in no way
deals with federal securities law, this "strong inference" standard is inapplicable here.

Preferred Care's own CEO.  However, Humana's arguments regarding the source of the rumors

miss the point.  Humana was required to keep the pending sale confidential, and it would be a

breach of the Confidentiality Agreement even if it were only "a" source of the rumor.  And there

is evidence that Humana was "a" source of the rumor.  For example, a Preferred Care provider,

Dr. Gerardo Perez, testified that a Humana representative contacted him, asked him to switch to

Humana, and informed him that Humana was in the process of buying Preferred Care.  (Perez

Dep. 11:17-25, Nov. 12, 2008.)  Yet another Humana representative contacted Dr. Perez's office

manager and informed her of the same.  (Pumariega Dep. 10-11, Nov. 12, 3008.)  Humana

argues that the Court cannot consider this testimony, however, because it is hearsay.  (*See*

Humana's Reply to Plaintiff's Statement of Counter-Facts ¶ 47.)  These statements are not

hearsay because they are not being offered to prove that Humana was in the process of buying

Preferred Care.  In other words, the statements are not being offered for the truth of the matter

asserted, and, therefore, they are admissible.  Fed. R. Evid. 801(c).  In light of all the evidence,

the Court cannot find on the current record that it would unreasonable for a fact-finder to infer

that Humana may have been "a" source of the rumor.

The Court next considers whether any inference regarding causation is unreasonable.

The Court finds that it is not where Plaintiffs present evidence that the rumors regarding

Preferred Care's sale were reported back to Preferred Care personnel during the due diligence

period and that during this same time an abnormally high amount of Preferred Care members

disenrolled. (*See* Pls' Opp. SMF ¶ 49.)[19]

---

[19]     The Court again rejects Humana's argument that it may not consider this evidence
as hearsay for the reasons stated in note 14 *supra.*

For the foregoing reasons, the Court finds that Humana is not entitled to judgment as a matter of law on this issue of causation.

### D.     Tortious Interference

Humana's final argument is that Plaintiffs' claims for tortious interference fail as a matter of law because they are barred by the economic loss rule by virtue of the fact that they are largely identical to Plaintiffs' breach of contract claims.  Plaintiffs' claims for tortious interference are only different, Humana argues, to the extent that they alleges that Humana aided and abetted Preferred Care's providers in their breach of the non-solicitation provisions of their Preferred Care provider agreements by locating a Humana representative, Richard Mesa, at these doctors' offices for the purposes of disenrolling their patients from Preferred Care and enrolling them in Humana.  (*See* Am. Compl. ¶ 116(h).)  Humana further argues that this single allegation cannot stand, however, because it requires Preferred Care to pierce the corporate veil, which Plaintiffs have not alleged.

The Court finds that Plaintiffs' allegation regarding Richard Mesa is clearly not contained in Plaintiffs' breach of contract claims, and, therefore, their claims for tortious interference claim of member contracts are not barred by the economic loss rule.  In so holding, the Court rejects Humana's argument that this single allegation fails to save the day because it necessarily depends on Plaintiffs piercing the corporation veil, which they have not alleged.  Humana argues that because Richard Mesa works for its subsidiary, Humana Marketpoint, Inc., it cannot be held liable for his conduct absent veil piercing.  Humana wholly ignores, however, the possibility that it may be liable for Richard Mesa's actions under general agency principles.  *See In re Managed Care Litig.*, 298 F.Supp.2d 1259, 1309 (S.D. Fla. 2003).  Indeed, plaintiffs

have sought and recovered against corporate defendants for their agent's tortious interference with third-party business relationships. *See Gregg v. U.S. Indus., Inc.*, 887 F.2d 1462, 1473-1475 (11th Cir. 1989); *Peacock v. Gen. Motors Acceptance Corp.*, 432 So.2d 142 (Fla. 1st DCA 1983); *see also Tamiami Trail Tours, Inc. v. J.C. Cotton*, 463 So.2d 1126 (recognizing that a corporate defendant may be liable under vicarious liability for its agent's tortious interference). Plaintiffs' Amended Complaint alleges that Humana located one of its representatives, Richard Mesa, at the doctors' offices for the purpose of disenrolling their patients. Thus, Plaintiffs may prove at trial that Richard Mesa was acting as Humana's agent when he allegedly tortiously interfered with Preferred Care's member contracts.[20]   Accordingly, the Court denies Humana's request for judgment as a matter of law that it did not interfere with Preferred Care's member contracts.

However, the Court finds that the economic loss rule does bar Plaintiffs' claims that Humana tortiously interfered with their provider contracts. The Court has compared the allegations underlying Plaintiffs' breach of contract and tortious interference claims with regards to their providers and agrees with Humana that the only alleged conduct that is different is the conduct attributed to Humana's representative, Richard Mesa.[21]   With the exception of this single allegation as to member contracts, the conduct alleged in Plaintiffs' tortious interference

---

[20]   This allegation also saves Plaintiffs' claim for tortious interference of member contracts from being completely preempted by FUTSA. (*See* Court's Order on Motion to Dismiss, D.E. 86.)

[21]   Although Plaintiffs allege that Humana tortiously interfered with Preferred Care's member *and* provider contracts by locating Richard Mesa in the doctors' offices, this conduct cannot be relevant to any tortious interference with provider contracts because the doctors' Preferred Care contracts were already terminated by the time Richard Mesa arrived at the doctors' offices. (*See* Mesa Dep. 20:8-15, 32:14-22.)

claim is indistinguishable from the conduct underlying its breach of contract claims: (i)

disclosure and use of confidential information, including the sale itself;[22] and (ii) initiating

contacts with Preferred Care's providers and members outside the ordinary course of business.[23]

Therefore, the Court holds that Plaintiffs' claims for Humana's tortious interference of their

provider contracts is barred by the economic loss rule.[24]

## II.  Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs move for partial summary judgment on liability on Count I (breach of contract

- damages) and Count II (injunctive relief), seeking judgment as a matter of law that Humana

violated two of the eleven alleged breaches of the Confidentiality Agreement.  Under the

---

[22]        See Am. Compl. ¶¶ 116(a), (b), (c), (d), and (e).

[23]        See Am. Comp. ¶¶ 116(f) and (g).

[24]        Plaintiffs argue that their tortious interference claims are not identical to their breach of contract claims, and, therefore, the economic loss doctrine is wholly inapplicable.  In other words, Plaintiffs essentially argue that by using different words to describe the conduct underlying their tortious interference claim (i.e., that Humana "created a false impression" in the market that Preferred Care was exiting, or that Humana "seized upon this self-created misunderstanding" to convince Preferred Care providers to switch groups because they would ultimately end up with Humana anyway) it is immune from the economic loss doctrine.  Indeed, in this Court's earlier Order on Defendant's Motion to Dismiss (D.E. 86), the undersigned stated that Plaintiffs' tortious interference allegation regarding Humana's disclosure to third parties that it was in sale negotiations with Preferred Care and its creation of a false impression in the marketplace that Plaintiffs were exiting was one of the two factual allegations (the allegation regarding Richard Mesa being the other) that distinguished Plaintiffs' tortious interference claims from their breach of contract claims.  The Court has since re-evaluated these claims on a fuller record and now concludes that the conduct underlying Plaintiffs' tortious interference claim is already contemplated and prohibited by the Confidentiality Agreement.  Put another way, the aforementioned allegation regarding Humana's disclosures and falsified impressions are expressly prohibited by the Confidentiality Agreement, and Plaintiffs have allocated the risk for such conduct in that agreement.  To reward Plaintiffs' artful crafting of the allegations underlying their tortious interference claims, which essentially seek damages above and beyond what is already contemplated by the Confidentiality Agreement, would amount to giving Plaintiffs a free pass out of the economic loss doctrine.  This the Court cannot and will not do.

26

Confidentiality Agreement, Humana agreed to, *inter alia*:

(i)     obtain in writing from each person who received confidential information during the due diligence period an agreement to be bound to the terms of the Confidentiality Agreement and an agreement to not disclose such confidential information (hereinafter referred to as, the "Written Agreement Provision"); and

(ii)    destroy all financial and other information provided by the Plaintiffs, including any memoranda, notes, analyses, or other writings prepared by Humana in its possession or under its control, in the event that Humana did not purchase Preferred Care (hereinafter referred to as, the "Destruction Provision").

Plaintiffs allege that Humana breached the Confidentiality Agreement by failing to comply with these two provisions and seek specific performance and a mandatory injunction.[25]  (Am. Compl. ¶ 90(e), (f); Plaintiffs Motion at 18.)

In order to prevail on their Motion, Plaintiffs must establish (1) a valid contract, (2) a material breach, and (3) damages.  *Merin Hunter Codman, Inc. v. Wachenhut Corrections Corp.*, 941 SO.2d 396, 398 (Fla. 4th DCA 2006).  For the reasons stated below, the Court finds that Humana materially breached the Confidentiality Agreement, but nonetheless denies Plaintiffs' Motion because they have failed to alleged even nominal damages and, thus, have not put forth a *prima facie* case of breach of contract.

### A.      Material Breach

Humana does not argue that it breached the literal terms of the Written Agreement and

---

[25]     Specifically, Plaintiffs seek entry of a decree that would (1) compel Humana to conduct a full forensic investigation identifying, segregating and maintaining only for litigation purposes all of the due diligence documents that Humana was contractually obligated to destroy under the terms of the Confidentiality Agreement and requiring Humana to destroy all such documents at the conclusion of litigation, and (2) require Humana to formally inform its directors, officers, advisors, and employees to whom it disclosed Plaintiffs' confidential information that such information is strictly confidential and subject to the Confidentiality Agreement and to obtain from each such person a written agreement to be bound by the terms of the Confidentiality Agreement.

Destruction provisions; Humana argues that there is at least a genuine issue of material fact as to whether such literal breaches are *material.*

Under Florida law, the issue of whether a breach material is a question of fact. *Covelli Family, L.P. v. ABG5, LLC*, 977 So.2d 749, 752 (Fla. 4th DCA 2008). To constitute a material breach, a party's nonperformance must "go to the essence of the contract," and must not simply be a failure to perform "some part of his contractual duty." *Id.* (internal citations and quotations omitted).

The Court finds that the "essence" of the Confidentiality Agreement was just that – maintaining *confidentiality*. As Humana recognized in that agreement, it was receiving confidential information of a competitive nature from one of its competitors. The Confidentiality Agreement was put in place to ensure that such confidential information would not be used in a competitive way, but rather only used in consideration with Humana's decision to purchase Preferred Care.[26] To that end, Humana expressly agreed to be bound to certain conditions, including the Written Agreement and Destruction Provisions. Humana cannot simply argue now that because it took alternative steps to protect the confidential information it received (*e.g.,* verbally warning its representatives that the information was to be kept confidential) that it did not breach its duties under the Confidential Agreement.[27] Plaintiffs did

---

[26]     *See* Confidentiality Agreement ("We hereby acknowledge and agree that such information is a valuable asset of PCP and its members, has competitive value, and is of a confidential nature. We hereby agree that we shall continue to be bound by our obligations of confidentiality and other obligations hereunder until the earlier of (a) the consummation of a transaction between us and PCP involving the sale of the Company, or (b) the second (2nd) anniversary of [May 2, 2007]."); (Liston Dep., 19:17-25, 20.)

[27]     *See* Liston Dep. 22-23, 25, Nov. 7, 2009 (stating that he could not remember the steps, if any, Humana took to ensure compliance with the Written Agreement, but that generally

not contract to allow Humana to decide how best to protect their valuable and proprietary information.

Likewise, the Court finds unavailing Humana's argument that the breaches are not material because Plaintiffs cannot show that Humana misused the Plaintiffs' confidential information. The Confidentiality Agreement contains both negative covenants (*i.e.,* do not misuse the confidential information), as well as affirmative covenants (*i.e.,* the Written Agreement and Destruction Provisions). Humana's interpretation of "materiality" to only include "misuse" would simply read out the affirmative protections Plaintiffs bargained for. *See Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F.Supp.2d 1134, 1143 (M.D. Fla. 2007) (holding that plaintiffs did not need to prove misuse of information improperly retained under a confidentiality agreement because the agreement did not limit damages to only misuse of information). Plaintiffs contracted for the Written Agreement and Destruction Provisions and demonstrated that these protections were required as part of the sale process.[28] Accordingly, the Court finds that Humana's breach of the Written Agreement Provision and Destruction Provision constitute material breaches of the Confidentiality Agreement.

_____

Humana would verbally talk to their due diligence team about confidentiality).

[28] The Court is not at all persuaded by Humana's argument that these protections were not material to the Plaintiffs because they were not included in a earlier confidentiality agreement executed between the parties. The undisputed evidence shows that the earlier confidentiality agreement Humana is referring to did not include these protections because it was executed only to facilitate initial negotiations whereby Plaintiffs only disclosed "very high level financials," such as Plaintiffs' previous audited financials. (*See* Caruncho Dep. 215-220.) Once the parties agreed to engage in more extensive due diligence, however, Plaintiffs required Humana to enter into the subject Confidentiality Agreement to protect in order to protect Plaintiffs' valuable confidential and proprietary information. (*See id;* Carucho Declaration (D.E. 102-2) ¶ 6.)

**B.     Damages**

Notwithstanding the foregoing, the Court finds that Plaintiffs cannot succeed on their

Motion for one very simple reason: They have not put forth a *prima facie* case of breach of

contract because they have not alleged even nominal damages.  In fact, Plaintiffs blithely state,

"With regard to the third element [on damages], the Court need not consider the issue of

damages at this time because Plaintiffs are only seeking a partial summary judgment of

liability."  (Plaintiffs Motion at 11.)  Plaintiffs flatly ignore that damages is a necessary element

to establishing a *prima facie* case for breach of contract and, thus, for entering judgment as to

liability.  Instead, Plaintiffs cite an unpublished report and recommendation by a Magistrate

Judge from the Eastern District of Michigan to support their argument that they do not need to

prove up any damages at this time.  (*Id.* (citing *Kruschat v. Gen. Bearing Corp.*, 2007 WL

1018225, * (E.D. Mich. Jan. 9, 2007)).   The Court does not find this decision persuasive in part

because in that case the issue was not whether the party sustained damages, but rather how those

damages are to be calculated.  In other words, the issue of whether the plaintiff has established

its *prima facie* case for breach of contract was not before the court.  Meanwhile, the law is clear

that partial summary judgment on liability cannot be granted where a plaintiff offers no proof of

damage.  *See City of Miami Beach v. Carner*, 579 So.2d 248, 253 (Fla. 3d DCA 1991)

("[S]ummary judgment was inappropriate because proof of some actual damage is an element of

liability for breach of contract.")

Apparently recognizing the deficiency of their Motion, Plaintiffs' Reply Brief attempts

to put forth the case that Plaintiffs have been harmed by Humana's continued possession of their

confidential information.  (Plaintiffs' Reply at 9.)  Plaintiffs offer no evidence of this harm, by

affidavit or otherwise.  Instead, Plaintiffs summarily state that following the "undisputed facts" demonstrate harm:

- Humana is a direct competitor, and, for that reason, Plaintiffs required Humana to enter into a Confidentiality Agreement;

- Thomas Liston signed the Confidentiality Agreement on behalf of Humana;[29]

- Plaintiffs wanted the Document Destruction provision included because they wanted to remove any temptation and ability for Humana to misuse the confidential information;

- The Confidentiality Agreement contained a non-solicitation provision;

- No member of Humana's due diligence team complied with the Written Agreement Provision, and Thomas Liston did not distribute the Confidentiality Agreement to his team; and

- Plaintiffs would not have opened their books to Humana if it had not agreed to the Written Writing Provision.

(Plainitffs' Reply at 9.)  These facts, however, are irrelevant to the issue of damages.  They are simply relevant to Humana's breach.

For the foregoing reasons, the Court denies Plaintiffs' Motion for Partial Summary Judgment.

## Conclusion

It is hereby

ORDERED AND ADJUDGED that Plaintiffs' Motion (D.E. 104) is DENIED.  It is further

ORDERED AND ADJUDGED that Humana's Motion (D.E. 92) is GRANTED IN

---

[29]     Thomas Liston signed the Confidentiality Agreement as Senior Vice President of Strategy and Corporate Development at Humana, Inc.

31

PART AND DENIED IN PART in accordance with this Order.

DONE AND ORDERED in Chambers at Miami, Florida, this 9th day of April, 2009.

_____
URSULA UNGARO
UNITED STATES DISTRICT JUDGE

copies provided: Counsel of Record