UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-20424-CIV-UNGARO/SIMONTON

PREFERRED CARE PARTNERS
HOLDING CORP., et al.,

      Plaintiffs,

v.

HUMANA, INC.,

      Defendant.

_____/

<u>ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR SANCTIONS</u>

      Presently pending before the Court is Plaintiffs' Motion for Sanctions (DE # 153).

This motion is fully briefed (DE ## 163, 175) and referred to the undersigned Magistrate

Judge (DE # 170).[1]  A hearing was held before the undersigned Magistrate Judge on April

3, 2009.  Based upon a careful review of the record as a whole, including the parties'

arguments at the April 3, 2009 hearing, and for the reasons stated herein, Plaintiff's

motion for sanctions is GRANTED IN PART AND DENIED IN PART.

      I.      <u>BACKGROUND</u>

      Plaintiffs Preferred Care Partners Holding Corp. and Preferred Care Partners, Inc.

(collectively, "PCP") brought this action against Defendant Humana, Inc. to recover

damages that it alleges resulted from unsuccessful negotiations to sell PCP to Humana.

According to the Amended Complaint, PCP operates a health plan with a Medicare

_____

[1]  Plaintiffs filed a notice of supplemental authority (DE # 191) in connection with this motion, as well as a sealed supplemental appendix, which was filed under seal on April 6, 2009.

Advantage Contract which puts them in direct competition with Defendant Humana, Inc. ("Humana").  In 2007, the parties began negotiating a sale of PCP to Humana; and, as part of the due diligence process, PCP permitted Humana to view its sensitive proprietary information ("due diligence information") under the terms of a Confidentiality Agreement.

After the negotiations failed, PCP alleges, Humana breached the Confidentiality Agreement by, *inter alia*, using the due diligence information to compete with PCP; disclosing the due diligence information to third parties; representing to the public that a sale of PCP to Humana was imminent; using the due diligence information to target and poach PCP's physician providers and their patients; and failing to destroy all of the due diligence information at the close of the negotiations (Count I).  In addition,  PCP sought specific performance and injunctive relief to prevent Humana from using the due diligence information to compete with PCP; disclosing the due diligence information to third parties; disclosing the fact that PCP and Humana discussed a sale; contacting PCP's providers or members; and, to require Humana to destroy all of the due diligence information in its possession (Count II).  PCP also sued Humana for monetary damages (Count III) and injunctive relief (Count IV) under the Florida Trade Secrets Act, Fla. Stat. §§ 688.001-688.009, as well as for tortious interference with advantageous business relationships (Count V) and breach of fiduciary duty (Count VI) (DE # 90).

In summary, PCP's motion for sanctions arises from the fact that, approximately two months after the expiration of the discovery period and one month before trial, Humana employees found over 10,000 pages of due diligence documents on their computers that should have been destroyed under the terms of the Confidentiality Agreement governing the proposed sale of PCP to Humana.  Thus, Humana's lawyers

instructed the employees to print copies of those documents so they could be produced to PCP and to delete the electronic versions of those documents that remained on their computers.  PCP filed its motion for sanctions on the grounds that the deletion of the emails (the so-called "print and purge scheme") inappropriately destroyed evidence relevant to its claims against Humana; and, that the concomitant untimely production of over 10,000 pages of documents (the so-called "document dump")[2] was either an intentional effort to sandbag PCP on the eve of trial or at least was the result of Humana's grossly negligent execution of its discovery obligations.

II.    **LEGAL FRAMEWORK FOR ANALYSIS**

It is clear from the outset that Humana failed to carry out its discovery obligations in accordance with the Federal and Local Rules.  Among other things, Humana discovered hundreds of thousands of pages of documents relevant to this lawsuit two months after the close of discovery and one month before the scheduled trial date, which caused it to turn over to approximately 10,000 documents on the eve of trial.  In addition, upon its late discovery of these documents Humana attempted to balance its obligation to destroy confidential due diligence information with its obligation to preserve documents relevant to ongoing litigation by simply purging vast swaths of electronic material without notifying opposing counsel or notifying the Court.  PCP contends, and the undersigned agrees, that Humana's discovery conduct leaves the impression that there may be additional documents that it has overlooked and, to this

---

[2]  At the time that PCP filed its motion for sanctions on February 17, 2009, it was expecting another "document dump" based on the fact that Humana was in the process of reviewing approximately 60,000 potentially responsive documents which were in the possession of Humana's in-house counsel, but overlooked and neglected.  On March 4, 2009, after Humana culled the duplicative, irrelevant and privileged documents, it finally produced an additional 35 documents on March 4, 2009.

day, failed to hand over to PCP.  The primary issues in contention concern the reasons

for these acts and omissions, and the appropriate remedy.  Therefore, it is useful to set

forth at the outset the framework by which the events detailed below will be analyzed.

      A.  <u>Rules 16 and 37 of the Federal Rules of Civil Procedure</u>

      In the context of this case, the primary source of this Court's authority to issue

sanctions in response to a party's failure to timely provide documents in discovery

stems from Federal Rules of Civil Procedure 16 and 37.  Rule 16 provides that:

> On motion or on its own, the court may issue any just orders, including
> those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its attorney . . .
> fails to obey a scheduling or other pretrial order.

Fed. R. Civ. P. 16.

      A party's failure to comply with its discovery obligations within the time provided

by the Court's Scheduling Order constitutes a violation of Rule 16, *see Albemarle Corp.*

*v. Chemtura Corp.*, 251 F.R.D. 204, 206 (E.D. La. 2008), and triggers the Court's authority

to impose sanctions under Rule 37(b)(2), which

> may include the following:
>
> (ii)    prohibiting the disobedient party from supporting or opposing
>        designated claims or defenses, or from introducing designated
>        matters in evidence;
>
> (iii)   striking pleadings in whole or in part;
>
> (iv)   staying further proceedings until the order is obeyed;
>
> (v)    dismissing the action or proceeding in whole or in part;
>
> (vi)   rendering a default judgment against the disobedient party; or
>
> (vii)  treating as contempt of court the failure to obey any order except an
>        order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A).

This rule gives district judges broad discretion to fashion appropriate sanctions for violation of discovery orders.  *Malautea v. Suzuki Motor Company, Ltd.*, 987 F.2d 1536 (11th Cir. 1993).  Rule 37 sanctions are imposed not only to prevent unfair prejudice to the litigants but also to insure the integrity of the discovery process.  *Sphinx Int'l, Inc., v. Nat'l Union fire Ins. Co. of Pitt.,*  2003 WL 24871000, at * 8 (M.D. Fla. March 21, 2003), *citing Aztec Steel Co. v. Fla. Steel Corp.*, 691 F.2d 480, 482  (11th Cir.1982).  In determining the appropriate sanction, the Court must consider whether "a less drastic but equally effective remedy could have been fashioned*." Sphinx, at *8,  citing Aztec Steel Co.* at 481-482.

However, as the Supreme Court has observed,  "the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Nat'l Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643 (1976).

Thus, the magnitude of sanctions awarded is bounded under Rule 37 only by that which is "reasonable" in light of the circumstances. *Carlucci v. Piper Aircraft Corp.,* 775 F. 2d 1440 (11th Cir. 1985).   Permissible purposes of sanctions include: 1) compensating the court and other parties for the added expense caused by the abusive conduct; 2) compelling discovery; 3) deterring others from engaging in similar conduct; and 4) penalizing the guilty party or attorney. *Id.*, *citing Roadway Express v. Piper* 447 U.S. 752, 764 (1980)*; National Hockey League,* 427 U.S. at 643*; Aztec Steel,* 691 F.2d at 482.

The Eleventh Circuit has explained that, although the rule gives broad discretion to impose appropriate sanctions, that discretion is not unbridled.  In *Malautea, supra.* at

5

1542, the Court provided guidance regarding the imposition of the ultimate sanction: "[A] default judgment sanction requires a willful or bad faith failure to obey a discovery order. *Societe Internationale pour Participations Industrielles et Commerciales v. Rogers*, 357 U.S. 197, 212 (1958).  Violation of a discovery order caused by simple negligence, misunderstanding, or inability to comply will not justify a Rule 37 default judgment or dismissal.  *See In re Chase and Sanborn Corp.*, 872 F.2d 397, 400 (11th Cir. 1989); *Equal Employment Opportunity Comm'n v. Troy State Univ.*, 693 F.2d 1353, 1357 (11th Cir.1982).  The severe sanction of a dismissal or default judgment is appropriate only as a last resort, when less drastic sanctions would not ensure compliance with the court's orders.  *See Navarro v. Cohan*, 856 F.2d 141, 142 (11th Cir.1988).

Reviewing courts have also found an abuse of discretion where a trial court dismisses a case for discovery violations where the party's failure to comply is due to confusion or a misunderstanding of the court's order rather than bad faith or a callous disregard of an order, if the prejudice to the innocent party is not significant.  *See E.E.O.C. v. Troy State Univ.*, 693 F. 2d 1353, 1358 (11th Cir. 1982); *accord  Searock v. Stripling*, 736 F. 2d 650 (11th Cir. 1984) (stating whether other party's preparation for trial was substantially prejudiced is consideration for dismissal under Rule 37).

B. <u>The Inherent Authority of the Court</u>

In addition to the authority expressly provided by the Federal Rules with respect to discovery practices, the Court has an inherent power to regulate litigation and sanction the parties, as well as their counsel, for abusive practices.  *Telectron, Inc.  v. Overhead Door Corp.*, 116 F.R.D. 107, 126 (S.D. Fla.  1987), *citing Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980).  These powers include the inherent authority to enter default judgment for destruction of evidence.  As stated by the Court in *Telectron*, *id*.  at

6

127, *quoting Wm. T. Thompson v. General Nutrition*, 593 F. Supp. 1443, 1455 (C.D. Cal. 1984):

> Sanctions may be imposed against a litigant who is on notice that documents and information in its possession are relevant to litigation, or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence, and destroys such documents and information. While a litigant is under no duty to keep or retain every document in its possession once a complaint is filed, it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request.

*Accord Banco Latino, S.A.C.A. v. Gomez Lopez*, 53 F. Supp. 2d 1273 (S.D. Fla. 1999).

These principles apply equally to the destruction of electronic evidence and its preservation for purposes of litigation, as recognized by the Court in *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y. 2004):

> Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a "litigation hold" to ensure the preservation of relevant documents. As a general rule, that litigation hold does not apply to inaccessible backup tapes (e.g., those typically maintained solely for the purpose of disaster recovery), which may continue to be recycled on the schedule set forth in the company's policy. On the other hand, if backup tapes are accessible (i.e., actively used for information retrieval), then such tapes would likely be subject to the litigation hold.

*Id*. at 431.

Prior to 2005, the clear law of the In the Eleventh Circuit precluded courts from drawing an adverse inference from a party's failure to preserve evidence *only* when the absence of that evidence is predicated on bad faith. *Banco Latino, S.A.C.A. v. Gomez Lopez*, 53 F. Supp 2d 1273, 1277 n.3 (S.D. Fla. 1999) (recognizing "Eleventh Circuit precedent which clearly imposes a requirement of bad faith for the imposition of

sanctions in connection with the destruction of evidence"); *accord Bashir v. Amtrak,* 119 F. 3d 929 (11th Cir. 1997).  However, at least one Court in this Circuit has interpreted the Eleventh Circuit's decision in *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005), as relegating the bad faith inquiry as one of a handful of factors to consider, including a balancing of the spoliator's "culpability against the prejudice to the opposing party," which incorporates an evaluation of the spoliator's culpability in light of the precautions used to safeguard the evidence.  *Brown v. Chertoff*, 563 F. Supp. 2d 1372, 1381 (S.D. Ga. 2008).

Finally, it is important to recognize the strong preference for a determination on the merits of a dispute.  "The broad discretion of the district court to manage its affairs is governed, of course, by the most fundamental safeguard of fairness: the Due Process Clause of the Fifth Amendment.  To comply with the Due Process Clause, a court must impose sanctions that are both 'just' and 'specifically related to the particular 'claim'"or defense affected by the misconduct.  *Serra Chevrolet, Inc.  v.  General Motors Corp.*, 446 F.3d 1137, 1151 (11th Cir.  2006), (internal citation omitted), *quoting Ins. Corp. of Ireland v.  Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982).  Thus, for example, if there is no nexus between the information destroyed or not produced and Plaintiff's claim or Defendant's defense, it would not be appropriate to enter a default.

The following chronology of events,  which describes Humana's offending conduct, is set forth below with these principles in mind.

### III.    RELEVANT FACTUAL HISTORY

Pursuant to this Court's Order, the discovery period in this case expired on November 17, 2008 (DE # 66).

According to the affidavit of Humana's trial counsel, Andrew S. Berman, he

8

believed that Humana had fully complied with its discovery obligations as the discovery deadline approached (DE # 163, Ex. B).  This belief was based on the fact that the Confidentiality Agreement governing the proposed sale of PCP to Humana mandated that any due diligence information obtained by Humana was to be destroyed at the end of the negotiations.

According to Humana, its employees and lawyers mistakenly believed they were in compliance with the Confidentiality Agreement because, although the employees deleted all emails related to the due diligence process in their in-boxes, they were unaware that copies of the emails remained on their computer in a separate file.

However, on November 5, 2008, immediately prior to his deposition, a Humana employee named Charles Beckman discovered emails relating to the due diligence process on his computer that he previously thought he had deleted (DE # 163, Ex. B at 2, ¶ 4).  PCP asserts that this discovery should have alerted Humana and its counsel to the fact that not all documents had been deleted as required by the Confidentiality Agreement, and should have caused a review to uncover additional electronic documents (Pls.' Supp. Appx.),[3]  Humana insists that the documents found on November 5, 2008 related to a prior proposed sale from 2006, and that Humana was not aware of the possibility that its production was incomplete until December 10, 2008, when Mr. Beckman found documents relating to proposed sale at issue in this case.[4]

_____

[3]  References to the Supplemental Documentation in Support of Plaintiffs' Motion for Sanctions, which was filed under seal on April 6, 2009, are referred to as "Pls.' Supp. Appx."

[4]  A review of the emails prior to Beckman's deposition included in PCP's supplemental appendix, which was filed under seal on April 6, 2008, shows that some of the Beckman emails are dated after May 2007, at the time that PCP and Humana began conducting renewed negotiations, after the original 2006 negotiations failed.  The Court

On November 24, 2008, approximately one week after the discovery period ended, PCP filed a Motion for Partial Summary Judgment, in which it argued that Humana violated the Confidentiality Agreement by failing to destroy all of the due diligence information in its possession.  Thus, PCP requested that the Court order a forensic investigation of Humana's computer system to identify the extent of Humana's breach (DE # 104).[5]

Around this same time, Charles Beckman once again reviewed the emails that were stored on his computer and discovered additional due diligence information (DE # 163, Ex. E at 7, ¶ 6).  On December 10, 2008, Andrew S. Berman was notified that these additional documents were found; and, based on the volume of documents, he recognized the possibility that other Humana employees may have shared Beckman's belief that all the emails containing due diligence information had been deleted from their computers, without realizing that the emails were still retrievable from other folders on their computers  (DE # 163, Ex. B at 2, ¶¶ 4-5).

Therefore, counsel for Humana immediately issued a directive to relevant employees, ordering them to: review their computers for due diligence information; send a printed copy of any information found on their computers to Humana's counsel; and, finally, delete the information from their computers.  Humana asserts that it made a good-faith effort to mitigate its technical breach of the Confidentiality Agreement by

---

does not condone this careless misstatement by Humana's counsel; however, the fact that these isolated emails were discovered by Beckman does not alter the analysis.

[5]  Plaintiff also moved for partial summary judgment on the grounds that Humana violated the provision of the Confidentiality Agreement requiring that all Humana employees participating in due diligence agree, *in writing*, to be bound by the terms of Confidentiality Agreement (DE # 104).

removing the confidential data from the hands of individual employees dispersed throughout the country, while, at the same time, complying with its obligation to preserve documents relevant to litigation by printing the documents prior to deletion and sending them to counsel to be consolidated and turned over to PCP's attorneys (DE # 163 at 8-9).[6]  Humana acknowledges that it did not consult with PCP or advise the Court regarding this conundrum before embarking on this course of action.

Between December 10 and 22, 2008, Humana employees conducted the requested searches, confirming Mr. Berman's hunch that Mr. Beckman's failure to delete all emails was not isolated, as the searches conducted by Humana employees resulted in the discovery of over 10,000 new documents (DE # 163, Ex. B).

At the April 3, 2009 hearing, Mr. Berman explained that the relevant Humana employees created email files on their computers titled "Partagas," the code word used to identify PCP during the confidential due diligence process; and, they put all emails relevant to the due diligence of PCP into that file.  At the end of the negotiations, many of Humana's employees deleted their respective "Partagas" files without realizing that, although the emails were no longer accessible as they ordinarily would be in their computer inboxes, copies of those emails remained saved in folders elsewhere on their computers, which the employees did not discover until they were specifically ordered to conduct a thorough review for these documents.

After the renewed searches were completed on December 22, 2009, Mr. Berman

---

[6]  Humana takes the position that the "printing and deleting of this electronically-stored information did not result in the destruction of *any* responsive documents, the total universe of which has been produced to [PCP] in paper form (or its equivalent) and has been preserved in its 'native' electronic format on Humana's long term storage system" (DE # 163 at 8-9).

averred that, because trial counsel were preoccupied with the preparation of trial documents – including the pretrial stipulation, jury instructions, summary judgment briefs and motions *in limine* – he assigned to Humana's in-house attorney, Heidi Garwood, the task of beginning to review the newly produced documents and flagging materials that appeared to be subject to the attorney-client privilege.  Ms. Garwood's review took place over 13 hours on or about December 23 to 24, 2008 (DE # 163, Ex. B at 2-3).

On December 24, 2008, over the course of eight hours, an associate at Mr. Berman's law firm took over this task where Ms. Garwood left off, and reviewed additional documents, some of which he flagged as privileged (*id.*).

On December 25, 2008, Mr. Berman spent a half-day reviewing the remainder of the documents for privileged material (*id.*).

On December 29, 2008, the documents were provided to a copy service; and, they were returned to Humana's counsel on January 5, 2009 (*id.*).

During this time, Mr. Berman's law partner reviewed only those documents that had been flagged as privileged or non-responsive.  As a result of this review, Humana concluded that some of these documents were not, in fact, privileged and they were therefore provided to PCP (*id.*).

On January 15, 2009, after a delay due to the health issues of Humana's counsel, Humana's supplemental production of documents was delivered to PCP's counsel, who began reviewing the documents immediately.  On January 18, 2009, PCP's counsel received Humana's privilege log.

On January 21, 2009, after conducting an abbreviated review of the 10,000 pages of documents, PCP's counsel argued that Humana's supplemental production of

documents, which occurred two months after the expiration of the discovery period, included "critical" information; and, therefore requested that the Court issue a 45-day continuance of the trial date; permit additional discovery – up to thirty days prior to the new trial date – with respect to the new information; and require Humana to make out-of-state witnesses available for deposition in Miami.  PCP also sought leave to file an Amended Complaint, if appropriate; to supplement its motion for summary judgment, as well as its response in opposition to Humana's motion for summary judgment and its response in opposition to Humana's motion to exclude its expert witness; and to seek sanctions, if appropriate.  Finally, PCP requested the entry of an Order requiring it to explain its procedure for searching for documents in this case.  Humana did not oppose PCP's request to continue the trial date and to reopen discovery for the limited purpose of investigating the issues raised by the new materials (DE # 148).

On January 26, 2009 the District Court denied PCP's motion, except that it permitted PCP to seek sanctions against Humana and any other relief it deemed warranted (DE # 150).

Therefore, on February 17, 2009, Plaintiff filed the instant motion for sanctions based on the "document dump" of 10,000 documents two months after the close of discovery, as well as the deletion of documents pursuant to the "print and purge" directive issued by Humana's counsel (DE # 153).

On March 4, 2009, Humana produced an additional 35 documents that had not been produced.  These documents were culled from 60,000 documents that were delivered to Humana's in-house counsel, Heidi Garwood, in July 2008, but were overlooked by Ms. Garwood until January or February 2009 because she "did not realize [their] significance" until this time.  As the parties clarified at the April 3, 2009 hearing,

13

Ms. Garwood was sent a link to these 60,000 documents in July 2008 via an email from Humana's IT department, which had completed a search of Humana's computers for documents pertinent to this case (DE # 163, Ex. A).[7]  As described in more detail below, PCP contests the methodology used by Humana to reduce the batch of 60,000 documents to the 35 documents that were turned over to PCP; and, PCP speculates that if the documents were filtered using different search terms, or if the search was broadened to include more relevant employees, then the results would be greater.

For the first time at the April 3, 2009 hearing, Humana revealed that a search of its computer system revealed 30,000-40,000 pages of additional documents from the email records of Dr. Terry Smith that it did not previously know existed, although counsel proffered, without objection, that these emails were determined to be irrelevant to this lawsuit.

On March 10, 2009, PCP's counsel contacted Humana's counsel to request, in light of Humana's discovery failings and delayed requests to return inadvertently disclosed privileged materials, that Humana conduct a complete review of the documents it had produced and create a final list that identified each and every purportedly privileged document that it inadvertently produced to PCP.  On March 12,

---

[7]  Heidi Garwood added that the responsive documents consisted of

12 emails with attachments, 14 emails with no attachments and 9 documents turned out to be responsive and appeared to have not yet been produced to [PCP] either during the discovery period or in January 15, 2009 supplemental production.  It is, however, possible that these documents were already produced, but we cannot confirm with certainty so we are producing them anyway.  All such documents appear to be cumulative or immaterial

(DE # 163, Ex. A at 3, ¶ 8).

2009, Humana responded to report that it would not comply with this request, but that it believed it had requested the return of every privileged document that was inadvertently produced.  Thereafter, PCP discovered 38 documents that were produced by Humana, even though they were listed on Humana's privilege logs.

III.   <u>ANALYSIS</u>

The undersigned notes at the outset that Humana's performance in carrying out its discovery obligations in this case was clearly egregious.  Among other things, Humana admits that it was unaware that it had hundreds of thousands of pages of documents in its possession that were relevant to this case until one month before trial; and, when it was faced with the conundrum of realizing that its employees failed to effectively delete tens of thousands of emails as they were required to do pursuant to the Confidentiality Agreement that forms the basis of this lawsuit, Humana's counsel neglected to consult with opposing counsel or notify the Court before tarnishing the evidentiary record of electronic data in this case by simply ordering their employees to print hard copies of these documents and purge them from their computers.  In assessing an appropriate sanction for Humana's discovery failings, however, it is important to note that the record reflects that its shortcomings were neither intentional nor done in bad faith, but rather resulted from the grossly negligent oversights of counsel.

PCP argues that it was prejudiced by the "document dump" and the "print and purge scheme" because it was deprived of the ability to utilize documents reaching "to the core allegations in [PCP]'s Amended Complaint" (DE # 153 at 6).  PCP contends that, as a result, it is entitled to relief in the form of an Order:

(1)   entering a default judgment in its favor based on Humana's willful and bad

faith discovery conduct that prejudiced PCP and cannot be adequately punished and deterred by the imposition of lesser sanctions;

(2)      granting its motion for partial summary judgment (DE # 104) based on Humana's admission that it failed to destroy all due diligence information and denying Humana's Motion for summary judgment (DE # 92);[8]

(3)      directing that certain matters be deemed admitted at trial, including that Humana circulated rumors regarding its contemplated acquisition of PCP, that Humana implemented a plan to utilize due diligence information to poach PCP's members and providers, and that Humana's valuation of PCP's business was based on $7,823 per member enrolled in PCP's health plans;

(4)      prohibiting Humana from supporting its affirmative defenses;

(5)      giving the jury an adverse inference instruction based on Humana's destruction of documents;

(6)      denying Humana's motion to exclude the testimony of PCP's damages expert (DE # 94);

(7)      denying Humana's motion to strike the second amended report of PCP's damages expert (DE # 108); and

(8)      excluding the testimony of Humana's damages experts (DE # 153 at 14-20).

Based upon a careful review of the record, the undersigned concludes, primarily, that the appropriate remedy to address Humana's deficient execution of its discovery obligations is to permit PCP to conduct additional limited discovery pertaining to the

_____

[8]  The undersigned notes that the District Court entered an Order on April 9, 2009, granting in part and denying in part Humana's motion for summary judgment (DE # 92) and denying PCP's motion for partial summary judgment (DE # 104) (*see* DE # 197).

new information raised by Humana's supplemental production of documents, as well as Humana's back-up storage of electronic documents.[9]  The undersigned emphasizes that the scope of this discovery is not unbridled and must be tailored to address Humana's shortcomings in its production of relevant documents within the time provided and the resulting prejudice to PCP, as set forth below.  Thus, the undersigned has limited the scope and number of depositions to be taken.  If it appears that additional depositions are necessary, the parties may agree to them; or PCP may seek a further Order from the undersigned Magistrate Judge, which will be addressed expeditiously.

The undersigned further concludes that it is appropriate to assess a monetary sanction as a consequence of Humana's grossly negligent discovery conduct; and, that monetary sanction shall consist of the reasonable costs, including attorney's fees, associated with PCP's supplemental discovery in accordance with this Order, as well as the costs and attorney's fees incurred in connection with this Motion.

The undersigned finally concludes that it is appropriate to permit PCP's damages expert to submit an amended expert report which may incorporate information obtained by the late document production and the additional discovery permitted by this Order.

_____

[9]  The undersigned recognizes that, based on the District Court's Order denying PCP's unopposed motion for leave to conduct further discovery (DE # 150), PCP believed Humana's invitations to conduct further discovery were "hollow offers," since such discovery would not be permitted by the Court.  Although the Discovery Practices Handbook states that "[c]ounsel may, by agreement, conduct discovery after the formal completion date," S.D. Fla. L.R., Discovery Practices Handbook, Appx. A.I.E at 105, the undersigned appreciates PCP's reluctance to contravene the District Court's prior Order prohibiting further discovery.  The Handbook does not expressly address this situation, where the parties agree to conduct further discovery, but the Court has entered an Order denying a blanket request to extend the discovery deadline.  The undersigned concludes that, although the record was incomplete at the time that PCP initially moved for an extension of the discovery deadline, the parties have since constructed a record demonstrating that additional discovery is the most appropriate remedy to address Humana's deficient execution of its discovery obligations.

17

This renders moot the presently pending motion to exclude the testimony of Plaintiff's damages expert (DE # 94); and, Humana's motion to strike the second amended report of PCP's damages expert (DE # 108).

Reasonable sanctions in the context of this case are designed primarily (1) to compensate PCP for the added expense caused by Humana's neglect and carelessness and the burden it placed on the Court; (2) ensure that PCP obtains the evidence it is entitled to receive; and (3) deter future acts of neglect and careless by Humana and other similarly situated parties; although, to a lesser extent, they are also designed (4) to penalize Humana for its discovery conduct.  Given the primary goals of the sanctions imposed in this case, it is necessary to examine the particular ways in which PCP claims to have been prejudiced by the discovery abuses at issue here.

A.    Valuation of PCP Members

For the reasons stated below, the undersigned concludes that it is appropriate to sanction Humana for its failure to provide timely discovery regarding the valuation of PCP customers; that PCP shall be permitted to conduct additional limited discovery regarding such valuations; that Humana shall bear the reasonable cost of such discovery; that PCP's damages expert shall be permitted to file an amended expert report; and, that Humana's motions to exclude the testimony of PCP's damages expert (DE # 94) and to strike the second amended report of PCP's damages expert (DE # 108) shall be denied as moot.

1.    The Parties' Positions

PCP argues that, if it prevails on the merits of its claim that Humana improperly poached its customers, a central issue in the case will be how to establish the value of each of those misappropriated customers (DE # 153 at 8-9).  One of the documents that

18

was produced on January 16, 2009 includes an estimate by a Humana employee that the value of each PCP customer is approximately $7,800.  PCP contends this document is crucial because it conflicts with the opinion of Humana's damages expert, who estimated the value of each PCP customer to be roughly $2,800.  In addition, PCP states that it could have used this admission by PCP to challenge that employee's subsequent statement, during deposition, that Humana does not, "as a matter of practice, . . . compute per member amounts because it's meaningless" (Pls.' Sanctions Appx. No. 11 at 124: 8-9, 22-24).[10]

Humana, however, insists that this document is immaterial to this litigation because: (1) although it was inadvertently disclosed among Humana's 10,000 pages of supplemental discovery, it is subject to a claim of privilege and should be disregarded by the Court; (2) the $7,800 figure is not a "valuation" of PCP's customers, but rather a simple calculation of the amount Humana would pay for each one of PCP's 26,000 members if it were to purchase PCP for $210 million, as proposed in negotiations (i.e., $210 million divided by 26,000 members equals $7,800); and (3) Humana has produced documents and testimony that would have allowed it to determine, using simple arithmetic, the same information that is contained in the email (DE # 163 at 10-11).

At the hearing, PCP also argued that certain valuation reports prepared by Humana's investment banker, which were not previously disclosed, are also material to the opinion of their expert.  Humana responded that PCP had received one such report in timely discovery, and that the others were merely cumulative.

---

[10]   References to the Appendix to Plaintiffs' Motion for Sanctions, which contains 25 separate tabbed exhibits and was filed with this Court under seal, are referred to as "Pls.' Sanctions Appx.," followed by the exhibit number and the page and/or line number, as applicable.

2.    <u>Sanctions</u>

As explained in more detail in this Court's companion Order Regarding the

Parties' Submission of Documents for *In Camera Review*, the Valuation Email that serves

as the basis for this aspect of PCP's instant motion for sanctions is not an attorney-

client communication; and, even in the event that it was privileged, the privilege was

waived by virtue of its inadvertent production.

The undersigned agrees with PCP that Humana's per-member valuation of PCP's

customers for the purpose of proposing a "claw-back" provision in a purchase offer to

PCP could have been incorporated into the report generated by PCP's damages expert,

especially in light of the fact that Humana filed a motion to exclude this expert's

testimony based his purported reliance on unreliable valuation multiples.  It is

appropriate to permit PCP's damages expert to submit a revised expert report and offer

testimony that incorporates the discovery materials that were untimely produced to PCP

on January 16, 2009.  Therefore, PCP's damages expert shall be permitted to submit a

revised expert report; and  Humana's motions to exclude testimony from PCP's damages

expert on the grounds that he relied on unreliable valuation figures (DE # 94); and,

Humana's motion to strike the second amended report of PCP's damages expert shall be

denied as moot (DE # 108).

Moreover, PCP shall be permitted to conduct reasonable depositions based on

the new information at Humana's expense, including a further deposition of Humana's

damages expert, Patrick Gannon, as well as Humana employee Michael Russman, who

testified that Humana does not "compute per member amounts."

As a sanction to compensate PCP, and to deter and punish Humana's breach of

its discovery obligations, Humana shall bear the cost of these depositions, including

20

attorney's fees, at a mutually convenient time and location in Miami, Florida.

      **B.**     **Humana's Disclosure of its Contemplated Acquisition of PCP**

      For the reasons stated below, the undersigned concludes that it is appropriate to sanction Humana for its failure to provide timely discovery regarding Humana's role in circulating rumors regarding its contemplated acquisition of PCP in violation of the Confidentiality Agreement.  Thus, PCP shall be permitted to conduct additional limited discovery regarding Humana's alleged breach; and, Humana shall bear the reasonable costs, including attorney's fees, of such discovery.

      **1.**     **The Parties' Positions**

      PCP asserts that, buried within the 10,000 pages of documents produced on January 16, 2009, it found three emails, which amount to "scathing admissions" that Humana breached the confidentiality agreement by publicly disclosing that Humana was in negotiations to purchase PCP.  The first email is from one Humana employee, Ed Henry, to another Humana employee stating that, "I know word is already out on this, but I don't want anyone on our staff being the one fingered for leaking this" (Pls.' Sanctions Appx. No. 18).  The second email is from a third party to a Humana employee, Tom Liston, reporting that, "Local rumors are that [Humana] is buying [PCP]" (Pls.' Sanctions Appx. No. 19).  The third email is from a Humana employee, Michael Seltzer, to a third party, in which the Humana employee, referring to its efforts to purchase PCP, wrote, "I still want this one!" (Pls.' Sanctions Appx. No. 21).  PCP argues that it was entitled to depose the relevant individuals regarding the content of the emails, but that Humana's untimely document production deprived them of that opportunity (DE # 153 at 9-10).

      Humana refutes the notion that any of these emails constitute "scathing admissions."  Rather, according to Humana, the first email supports the notion that

Humana employees were not the cause of the rumors and that they were encouraged not to do anything that would cause them to be suspected of leaking information in violation of the Confidentiality Agreement; the second email was an unsolicited email *from* a third party *to* a Humana employee; and, the third email was not a disclosure of the negotiations to an ordinary third party, but rather was an email to the individual who brought PCP and Humana together for the purposes of consummating the sale and who was therefore already aware of the ongoing negotiations (DE # 163 at 11-12).[11]

### 2.   Sanctions

Based on Humana's failure to produce these documents in a timely manner during the discovery period, PCP shall be permitted to conduct follow-up depositions of Ed Henry, Tom Liston and Michael Seltzer regarding the new issues raised by the information provided in Humana's supplemental production of documents.

As a sanction to compensate PCP, and to deter and punish Humana's breach of its discovery obligations, Humana shall bear the reasonable costs, including attorney's fees, of these depositions at a mutually convenient time and location in Miami, Florida.

The undersigned notes that PCP's assertion that these emails constitute "scathing admissions" (DE # 153 at 10) is dubious; and therefore, at first blush, the prejudice to PCP is small.  Nevertheless, these emails can be interpreted to support PCP's theory of the case; and, since Humana has been consistently delinquent in carrying out its obligation to produce relevant documents, the undersigned questions whether there may be additional documents withheld and, therefore, PCP should be

---

[11]  Humana adds that the text of this email, which states that he "still want[s] this one" tends to disprove PCP's claim that Humana was never serious about purchasing PCP, but rather feigned interest in order to gain access to PCP's confidential proprietary data during due diligence to gain an unfair competitive advantage (DE # 163 at 12 n.16).

given the opportunity to conduct the depositions of Messrs. Henry, Liston and Seltzer with the full scope of information that it was entitled to have from the outset.

      C.    <u>Humana's Feigned Interest in Purchasing PCP</u>

      For the reasons stated below, the undersigned concludes that it is appropriate to sanction Humana for its failure to provide timely discovery regarding the allegation that Humana feigned interest in purchasing PCP for the purpose of obtaining PCP's proprietary information during due diligence.  Thus, PCP shall be permitted to conduct additional limited discovery in connection with Humana's intent in negotiating a potential sale of PCP; and, Humana shall bear the reasonable cost of such discovery.

      1.    <u>The Parties' Positions</u>

      PCP points to a chain of email correspondence produced on January 16, 2009 in support of its claim that Humana never intended to purchase PCP, but rather feigned interest in the sale in order to gain access to the due diligence information for the purpose of determining the pricing necessary to poach PCP's customers.  In this document, one Humana employee, Thomas Payne, asks another Humana employee, Amy Boone, whether it would be better for Humana to purchase PCP or, alternatively, to "capture" its customers "through aggressive product pricing."  The recipient of the email responded that the answers will need to be answered "through further due diligence" (Pls.' Sanctions Appx. 23).  PCP claims that it was prejudiced because it was precluded from conducting a deposition of the author of this email and following the trail of this purportedly incriminating conversation (DE # 153 at 10).

      Humana maintains that this email is insignificant and its meaning is misconstrued by PCP.  The email chain, according to Humana, constitutes a conversation among two "non-decision makers" addressing general considerations regarding the proposed sale.

23

The response by a Humana employee that the answer to such questions would be answered "through further due diligence" does not imply that Humana intended to improperly use PCP's due diligence information to engage in unfair competition for customers; and that, in any event, this narrative conflicts with PCP's allegations that Humana improperly used due diligence information to offer more lucrative deals to PCP's physician-providers, not that it used the due diligence information to offer lower prices to PCP's patient-customers (DE # 163 at 12-13).

2.    Sanctions

Based on Humana's failure to produce these documents in a timely manner during the discovery period, PCP shall be permitted to conduct depositions of Thomas Payne and Amy Boone, regarding the issues raised by new information provided in Humana's supplemental production of documents.

As a sanction to deter and punish Humana's breach of its discovery obligations, it shall bear the cost of these depositions at a mutually convenient time and location in Miami, Florida.

The undersigned notes that Humana's obligation to bear the cost of depositions applies to the depositions both of witness who have already been deposed and witnesses who PCP will depose for the first time.  Although Humana agreed to bear the costs associated with follow-up depositions arising from its untimely production of documents, it opposed paying for depositions of individuals who were not previously deposed.  Humana's logic is that PCP bore the cost of original depositions and it is therefore fair to require Humana pay for the additional cost of re-examining these deponents; but, Humana maintains that PCP will receive a windfall if Humana is to pay the cost of deposing any particular witness – like Thomas Payne, for example – for the

24

first time.  The undersigned disagrees.  The purpose of this sanction, in part, is to punish and deter Humana's gross negligence of its discovery obligations; and, given the indirect costs that Humana's untimely production of over 10,000 pages of documents has imposed on PCP in terms of the disruption to PCP's efforts to prepare for trial which is set to begin in approximately one month, ordering Humana to bear the monetary cost of deposing a witness whose relevance to this case was revealed based on its untimely document production does not result in an unfair windfall.

   D.    **Timeline Evidence**

   For the reasons stated below, the undersigned concludes that it is appropriate to sanction Humana for its failure to provide timely discovery regarding the manner and timing of Humana's use of PCP's sensitive propriety information during due diligence. Thus, PCP shall be permitted to conduct additional limited discovery regarding Humana's alleged breach of the Confidentiality Agreement by improperly using PCP's due diligence information to create a "target list" of PCP providers; and, Humana shall bear the reasonable cost of such discovery.

   1.    **The Parties' Positions**

   PCP contends that certain information revealed in Humana's supplemental production of documents suggests that the timeline of relevant events regarding Humana's alleged use of due diligence information is different than the one described by Humana employees in their depositions.  Specifically, PCP alleges that Humana compiled a "target list" of PCP providers by improperly using the information provided to it in due diligence.  Although a Humana employee, Ed Henry, acknowledged that he viewed PCP's proprietary due diligence information, he testified that he used it permissibly for the sole purpose of creating a "provider overlap analysis."  PCP

however, claims that new evidence shows that Ed Henry's deposition testimony was misleading and that the time and manner in which he used the due diligence information suggests that it was used to create an impermissible "target list," rather than a permissible "provider overlap analysis" (DE # 153 at 10-12).

### 2. Sanctions

Based on Humana's failure to produce these documents in a timely manner during the discovery period, PCP shall be permitted to conduct a further deposition of Ed Henry, regarding the issues raised by new information provided in Humana's supplemental production of documents.

As a sanction to deter and punish Humana's breach of its discovery obligations, it shall bear the costs, including attorney's fees, of these depositions at a mutually convenient time and location in Miami, Florida.

### E. Fraudulent Inducement

For the reasons stated below, the undersigned concludes that PCP has failed to establish that it was prejudiced by the late disclosure of documents which might have given it a basis to develop evidence sufficient to seek leave to amend the Complaint to include a fraudulent inducement claim. Therefore, the undersigned will not impose a sanction against Humana for its failure to provide timely discovery in this regard. However, PCP will be permitted pose questions regarding these matters to any of the witnesses who are otherwise being deposed in accordance with this Order.

### 1. The Parties' Positions

PCP claims that documents included within the 10,000 pages of discovery served on January 16, 2009 would have given rise to a claim of fraud in the inducement, which PCP could not responsibly allege in its Complaint without these documents. The basis

26

of such a claim would have been that PCP declined other offers to purchase its business based upon Humana's representations regarding the certainty and speed with which it would complete the sale; but, based upon Humana's untimely production of documents, it appears that these representations were false.   One such document was an email chain among Humana employees stating that the local Humana subsidiary that PCP believed would be the acquiring entity did "not have enough money to buy" PCP, which PCP contends resulted in economic consequences that effectively killed the deal (Pls.' Sanctions Appx. 35).[12]  PCP also relied upon another document, referred to as the 50/50 email, but the Court has stricken this document as privileged; therefore it is not considered.

Humana refutes PCP's assertions that these documents would have supported a fraud in the inducement claim.  With respect to the now-stricken 50/50 Email, Humana argues that it referred Humana's potential acquisition of PCP in 2006, not the potential acquisition of PCP in 2007, which underlies this action.  In addition, Humana argues that PCP was not prejudiced by the untimely production of the email chain because (1) the identity of the acquiring entity was immaterial to the deal; (2) the alleged representations regarding the identity of the acquiring entity arose *after* the parties' began negotiating the sale; (3) Humana ultimately made an offer of $220 million, which was greater than the amount originally discussed and which PCP refused; and (4) any attempt to add a fraudulent inducement claim would be futile because such a claim would be barred by

---

[12]  Although Humana initially asserted that this document, bates stamped number HUMANA SUPP 009980, was privileged, it waived its privilege argument with regard to this document (DE # 173 at 5 n.10).

the economic loss rule (DE # 163 at 14-15).[13]

        2.    <u>Sanctions</u>

The above email chain should have been produced earlier; however, it is relatively innocuous, as Humana states.  The email chain was dated November 2, 2007, a time which was well into the negotiations.

The email begins with a question, "Can [PCP] be merged into CarePlus at the close of the transaction?  We would have to have the CarePlus contracts immediately to make this work.  Let's discuss when you get back from vacation."

There is then a response which states, "CarePlus does not have enough money to buy this one, Humana Inc. must buy it.  Ralph or Cindy – any ideas?"

Another employee then suggests, "Why can't Humana, Inc. make an investment of capital in CarePlus?"

The existence of this email is not sufficient to permit Plaintiffs to take unbridled discovery regarding the possibility of a fraudulent inducement claim.  Plaintiffs have pointed to no other evidence to support their speculation that the financial condition of CarePlus was material to the consummation of the transaction, and Plaintiffs have had ample opportunity to develop this theory during the course of regular discovery. Therefore, no sanctions are imposed regarding this email chain, although the Court will not preclude Plaintiffs from questioning witnesses in this regard, when those witnesses are otherwise being deposed pursuant to this Order.

---

[13]  Humana also asserts that PCP amended the Complaint prior to the expiration of the discovery period, but the fact that PCP may have amended the Complaint once is not relevant to an analysis of whether it could have amended it again based on documents that should have been produced by Humana within the applicable discovery deadline.

F.      **Incomplete Production Issues**

PCP insists, based on the discovery violations that Humana has admitted, that it lacks confidence that Humana has fully produced electronic documents in its possession.

1.      **Print and Purge Documents**

PCP contends that Humana's production of 10,000 documents on January 16, 2009 was incomplete because (1) Humana's employees cannot be trusted to have provided to counsel all of the documents that they found while carrying out counsel's "print and purge" directive between December 10 and 22, 2008; and, (2) even assuming that Humana's employees in fact printed hard copies of all of the relevant documents before purging them from their computers, the hard copies nonetheless omit important information, such as metadata and attachments to emails, which cannot be recreated by scouring Humana's computer back-up system.   The undersigned agrees that the decision by Humana's counsel to print and purge the documents its employees discovered between December 10 and 22, 2008 without consulting opposing counsel or advising the Court was an exercise in bad judgment and constituted a breach of Humana's discovery obligation to preserve evidence relevant to ongoing litigation.

On one hand, many of PCP's concerns, such as the searchability of Humana's backup computer data system, or Humana's lack of control over the backup systems of third parties that received the print and purge instructions (like law firms and investment banks assisting Humana in conducting due diligence) is speculative at this point and not based on actual information concerning relevant data that cannot be obtained, nor supported by an explanation of how that information would be relevant to the claims or defenses at issue in this case.   In addition, even though PCP contends, based on

Charles Beckman's inability to print or forward an email he discovered on his computer, due to electronic restrictions placed on the document, the undersigned credits the explanation provided by Humana's counsel at the April 3, 2009 hearing that this email represented a "one-in-a-million" anomaly; and, there is no reason to assume, as PCP's counsel does, that any other employees were, like Beckman, unable to print or forward certain emails and that, unlike Beckman, those employees simply purged those emails without recording their content or noting their existence in some other manner.  The undersigned thus expects, based on the representations Humana's representations before the Court, that a search of its electronic backup system will not yield any additional material information.

On the other hand, however, the undersigned cannot ignore Humana's documented discovery failings; the discrepancies PCP noted in Humana's imperfect attempts to recreate the information contained in the emails deleted pursuant to the print and purge directive; or the inconsistent accounts offered by Humana's counsel in an effort to explain those discrepancies.  In short, the undersigned questions the accuracy of Humana's unilateral statements that all material information has been produced.

Based on Humana's representations that the print and purge directive did not result in the destruction of any information that cannot be reconstructed by conducting an examination of Humana's computer backup system, PCP shall be permitted to conduct a forensic examination of Defendant's electronic data backup system for the purpose of verifying that the backup system maintains complete copies of all emails such that any purged emails would remain on that system; and, that all emails were produced despite the print and purge directive.  PCP's counsel shall coordinate with opposing counsel for the purpose of retrieving any information –  including metadata,

attachments or documents in their native format – which was deleted pursuant to the print and purge directive issued by Humana's counsel on December 10, 2008 and was not produced to PCP.

### 2.   March 4, 2009 Supplemental Production

The parties dispute whether Humana's March 4, 2009 production of approximately 35 documents is a comprehensive collection of the relevant and discoverable documents that were sent to Heidi Garwood in July 2008, considering the fact that the original sample consisted of approximately 60,000 documents.

Humana explains that it was appropriate to reduce the number of documents from 60,000 to 35 because, based on the materials that it already turned over, as well as the nature of its back-up system, it is reasonable to assume that many of the 60,000 documents had already been produced or were clearly irrelevant. Moreover, according to Humana, it understood the gravity of its oversight and, therefore, made a diligent effort to truly eliminate duplicative, cumulative or irrelevant documents to avoid the appearance that it was "dumping" a large number of documents on PCP on the eve of trial. For example, Humana hired an outside company, at a cost of $30,000-$40,000, to electronically image the 60,000, compare it to the documents Humana already produced in discovery, and eliminate the duplicates. Then, counsel for Humana conducted a review of the non-duplicate copies of documents that it received from the outside company and was able to eliminate additional documents that were substantively identical, but were not initially filtered out due to the fact that they had immaterial differences to documents previously produced, as well as documents that were not relevant to this case.

PCP, on the other hand, argues that it is facially unreasonable for Humana to have

been able to reduce a total sample of 60,000 documents to 35 documents without neglecting to produce documents that were relevant and discoverable.  In particular, at the April 3, 2009 hearing, PCP's counsel noted that Humana's description of its culling process indicated that Humana did not search the files of all relevant employees, or that it did not employ proper search terms.

At the April 3, 2009 hearing, Humana agreed to permit PCP to conduct an independent forensic examination of Humana's electronic back-up system; and, the undersigned that this is a reasonable concession.  PCP shall coordinate with opposing counsel  for the purpose of retrieving any information –  including metadata, attachments or documents in their native format – which was provided to Heidi Garwood in July 2008 and was not among the material produced to PCP on March 4, 2009.

G.    <u>Additional Sanctions Requested by Humana</u>

Humana's failure to realize until a month before trial that had neglected to realize that it was in the possession of hundreds of thousands of documents that are potentially relevant to this case is inexcusable.

Nevertheless, the undersigned finds that the errors committed by counsel were careless, not willful and that they were the product of bad judgment, not bad faith. Moreover, PCP has not shown that the prejudice resulting from Humana's untimely production is so severe that it cannot be remedied by imposing the lesser sanctions set forth above.  *See Owens v. Benton*, 190 Fed. Appx. 762, 763 (11th Cir. 2006) ("There is a strong preference that cases be heard on the merits instead of opposing sanctions."). Therefore, it is not appropriate to enter the dispositive relief that PCP seeks in the form of the entry of a default judgment against Humana; the entry of an Order granting PCP's motion for partial summary judgment (DE # 104); and the entry of an Order denying

Humana's motion for summary judgment (DE # 92).[14]

In sum, given the circumstances of the case as a whole and the rulings contained in this Order, it is not necessary or appropriate at this juncture to grant the additional relief sought by PCP, including directing that certain matters be deemed admitted at trial;[15] prohibiting Humana from supporting its affirmative defenses; giving the jury an adverse inference instruction based on Humana's destruction of documents; and excluding the testimony of Humana's damages experts (DE # 153 at 14-20).

In fashioning the sanctions which have been imposed, although those sanctions have been discussed in connection with each of the specific documents which Plaintiffs used as examples of the discovery deficiencies, the undersigned has considered the totality of the record, and determined that the most appropriate sanction at this point is to permit targeted discovery, and monetary sanctions.  However, if there are any additional material documents discovered during the forensic examination of the back-up computer system or the 60,000 documents contained in the initially ignored email link provided to Ms. Garwood, dispositive relief against Humana may well be warranted.  In addition, Plaintiffs may seek relief from any ruling on summary judgment if the additional discovery provides a basis for reconsideration.

Therefore, based upon a careful review of the record, including many documents

---

[14]  The undersigned notes that the District Court entered an Order on April 9, 2009, granting in part and denying in part Humana's motion for summary judgment (DE # 92) and denying PCP's motion for partial summary judgment (DE # 104) (*see* DE # 197).

[15]  PCP requested the Court deem the following matters established at trial: that Humana circulated rumors regarding its contemplated acquisition of PCP, that Humana implemented a plan to utilize due diligence information to poach PCP's members and providers, and that Humana's valuation of PCP's business was based on $7,823 per member enrolled in PCP's health plans (DE # 153 at 20).

not specifically cited in this order, and for the reasons stated above, it is hereby

**ORDERED AND ADJUDGED** that Plaintiffs' Motion for Sanctions (DE # 153) is **GRANTED IN PART AND DENIED IN PART**.  The following rulings are entered as a sanction for Defendant's grossly negligent discovery conduct:

1.      Defendant shall bear the reasonable costs, including attorney's fees, of PCP's additional limited discovery relevant to the matters raised by the information revealed in Defendant's supplemental production of documents as set forth above.  The parties shall endeavor to work together to minimize the time and expense necessary to conduct this limited supplemental discovery.  All discovery permitted by this Order must be completed within 45 days from the entry of this Order.

2.      Plaintiffs' damages expert, Alexander Fernandez, shall submit a Final Amended Expert Report within 30 days from the entry of this Order.  Defendant will not be permitted to redpose Mr. Fernandez.  Defendant's Motion to Exclude the Expert Testimony offered by PCP's damages expert (DE # 94); and, Defendant's Motion to Strike the Report submitted by PCP's damages expert (DE # 108), are **DENIED AS MOOT**.

3.      Within 30 days from the date of this Order, Plaintiffs shall be permitted to conduct a forensic examination of Defendant's electronic data backup system for the purpose of verifying that the backup system maintains complete copies of all emails such that any purged emails would remain on that system; and, that all emails were produced despite the "print and purge" directive.  In addition, Plaintiffs may conduct a forensic examination of the 60,000 documents contained in the email link sent to Ms. Garwood in July 2008, using mutually agreeable search parameters, to ensure that Humana has produced all relevant and discoverable documents from this collection.

34

Humana shall pay the costs of these forensic examinations.

4.      Plaintiffs' motion for the entry of an Order entering a default judgment in its favor; granting its motion for partial summary judgment (DE # 104); denying Humana's Motion for summary judgment (DE # 92); directing that certain matters be deemed admitted at trial; prohibiting Humana from supporting its affirmative defenses; and giving the jury an adverse inference instruction based on Humana's destruction of documents is **DENIED WITHOUT PREJUDICE** for Plaintiffs to seek relief based on a particularized showing that the additional discovery has not been sufficient to cure the prejudice resulting from the discovery violations.

5.   Plaintiffs are awarded reasonable costs, including attorney's fees, incurred in connection with this Motion for Sanctions.  In awarding this sanction, the undersigned recognizes that the Motion was only partially successful, and that much of the relief granted was unopposed.  Nevertheless, the discovery deficiencies were significant and this sanction is necessary as a deterrent.

**DONE AND ORDERED** in chambers in Miami, Florida on April 9, 2009.

*Andrea M. Simonton*

**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

Copies furnished to:
The Honorable Ursula Ungaro, United States District Judge
All counsel of record